TULAM (COUSCHER v.). See Case No. 3,287.

TULEY (BUEL v.). See Case No. 2,101.

---

## Case No. 14,234.

### The TULIP.

[Fish. Pr. Cas. 1; 3 Wash. C. C. 181.] [1]

District Court, D. Pennsylvania. Sept. 11, 1812.

Circuit Court, D. Pennsylvania. Oct. Term, 1812.

PRIZE — CARRYING ENEMY'S DISPATCHES — PROCEDURE IN PRIZE CASES.

[1. An American ship, engaged, with the knowledge of, and under contract with, her owner, in carrying dispatches of a public nature, sent under the charge of a messenger from a British minis-

---

[1] [3 Wash. C. C. 181, contains only a partial report.]

ter in this country, after a declaration of war, to his own government, is subject to condemnation as prize, as being engaged in the service of the enemy. In such case the cargo, if it belongs to the owner of the ship, partakes of the offence, and is also lawful prize.]

[2. Common-law principles and rules of evidence cannot be applied in a prize court. Its proceedings are totally different from those of any other court. Proofs and evidence are, of necessity, and the nature and exigencies of cases, permitted in prize courts.]

[3. Quaere: Whether when certified copies of dispatches and documents found on board a prize, and transmitted to the state department, are sent by the secretary to the court for inspection, with a request that their contents be not made public, the court has any power, as a substitute for the documents themselves, to certify their import for use as evidence in the proceedings.]

Prize.

PETERS, District Judge: This is a case of an American vessel, clearly documented as such, belonging to William Shaw, a naturalized citizen of New-York. The property in the vessel is not disputed; nor does there appear any objection to the title of William Shaw, to the brig captured. She was taken, as prize, by the Atlas, Moffat, duly commissioned as a privateer, on the 15th of July last, in her course from New-York for Lisbon. In appears, that great part of her lading was taken on board previously to the declaration of war. It was completed after that declaration was known, and generally promulgated. Her destination was originally, and, for aught that appears, decidedly to the contrary, ultimately, for Lisbon. Her cargo consisting of Indian corn, meal, beans, bees-wax, pork, and staves, was evidently calculated for the Lisbon market. After the war was declared, a contract was entered into, between the owner, William Shaw, and the late British minister, Mr. Foster, the evidence whereof is in the following words:—"New-York, 9th July, 1812. Sirs, In consequence of the declaration of war, by the United States of America, against Great Britain, it becomes indispensably necessary for me to forward despatches to his majesty's secretaries of state; and as no ordinary conveyance can be procured, I have been under the unpleasant necessity of entering into an agreement with the owner of the brig Tulip, James Funk, master, bound from hence to Lisbon, that, in consideration of his landing—Cleeland, the bearer of my despatches, in England, in his route to Lisbon, I would furnish him with a letter requesting and enjoining you, gentlemen, to permit the said brig to proceed to Lisbon, with her cargo, and to return to this port in ballast, without capture, or other interruption. I therefore beg you will be pleased to comply with my request. The Tulip was laden and ready for sea, at the time of my entering into the contract, and she has been detained several days by me. I have the honour to be, sirs, your most obedient humble servant, Aug. J. Foster.

To the officers commanding his majesty's ships of war, and private armed vessels, &c."

I extracted, from an authenticated copy of a despatch (the original having been sent by me to the secretary of state,. and the copy by him transmitted to the attorney of the district) the following sentence; being the only part relating to the cause. I certified—that it was a public despatch, giving important information to the British government, of a political and military nature, relating to force, preparation, and warlike operations. The despatch was directed "To the right honourable Lord Castlereagh." "My Lord. On condition of my granting a letter of recommendation to a merchant vessel, bound to Lisbon, the owner of the vessel, has agreed to land a messenger for me, in an English port." The passport appears to me, to have all the substantial ingredients of a licence, to which all British cruizers were bound to pay the like respect (its terms and consideration being either in progress to be fulfilled, or actually complied with) to which a licence immediately from the British government, would have been entitled. 1 Bl. Comm. 259, note; Donath v. Insurance Co. of North America, 4 Dall. [4 U. S.] 463. Although Mr. Foster was not, at the time, in a capacity to perform his official functions, as they related to the United States; yet, his acts, as they regarded his own government, and the officers of its navy, were binding; and, as to them, official. He was the minister of that government, returning from an embassy. His powers had, indeed, ceased, as to the government to which he had been sent; yet they were not extinguished by his own country, as regarded its interests and concerns. However valid the contract stated, and the passport were, as connected with his own government, they were, as to us, illegal and highly unjustifiable. The passport was accepted, by the owner of the brig, after the passing of the act, entitled, "An act to prohibit American vessels from proceeding to, or trading with the enemies of the United States, and for other purposes;" passed the 6th July last. The law could not have been known to the collector of New-York on the 8th; when he cleared out the vessel and cargo, for Lisbon. She did not leave the Hook till the 12th. But whether it was or was not known on board of the Tulip, before her departure from the Hook, does not appear. Some despatches and letters sent on board by Mr. Foster, to the care of James Cleeland, the messenger (a Trinity house pilot, on his return home from New-York) were directed for Lisbon, which he was desired to deliver to the captain of the Tulip: though other letters sent under his charge, at the same time, were directed to be put in the post-office in England. Only the papers necessary to prove American character in the vessel,

were shown to the captors, in the first instance. No papers or proofs, ascertaining the cargo to be American property, were then, or at any time since, shown to the captors, or exhibited to this court. The supercargo, Braine, swears, that he had verbal orders for selling the vessel and cargo, at Lisbon, for account of Shaw, of New-York; to whom, as he understood and believes, both belong. The master, Funk, swears, that he signed bill or bills of lading "to order;" and also declares his understanding and belief, that the property, in both vessel and cargo, belongs to William Shaw of New-York. As to the suspicion that this ownership was one in transitu, (induced by the circumstance of the bills of lading being "to order") there does not appear any other foundation for it; unless it can be laid in the papers herein after stated. No bill of lading, except the one hereafter mentioned, was found among the papers delivered into this court, by the captors, but an affidavit of the captain, Funk, was offered, to prove, that one had been delivered, by the captain of the Tulip, to the lieutenant of the Atlas. The court did not think this regular, in the stage of the cause in which it was offered; nor was it clear of the objection to it, it being sworn to by a witness who had been examined on the standing interrogatories, before an order for further proof. A ruse de guerre was practised by the captain of the Atlas, which was then and had been, under British colours, and called the privateer Pitt of Bermudas. He said "the Tulip was a good prize; and he should send her into Halifax." At this stage of the business, the passport from Mr. Foster was produced by the supercargo; together with the following document. An envelope (for there was no epistolary communication) was delivered with the passport, and not before, superscribed "to Messrs. Shaw and Carroll, merchants, Dublin;" and containing an invoice and bill of lading of the cargo, both dated the 17th of June, 1812. The invoice is without marks or numbers; it amounts in value to 11,839 dollars, 6 cents; it includes an item for commissions at five per cent. making 591 dollars, and 95 cents; and it is headed "Invoice of merchandise, shipped on board the brig Tulip, James Funk, master, for Lisbon, per order, and for account and risque of Messrs. Shaw and Carroll, merchants, Dublin." The bill of lading is signed by James Funk; it states the cargo to be shipped by William Shaw; it declares the cargo to be deliverable to the order of the shipper, upon payment of 4000 dollars freight; and an endorsement, by William Shaw, directs the captain to "deliver the within contents to the order of Messrs. Shaw and Carroll, of Dublin." This document with its enclosure, the character of Cleeland as a messenger, and the despatches entrusted to him by Mr. Foster, were all concealed in the first instance, from the knowl-

edge of the captor. Even at the time of the examination of the witnesses in preparatorio, it appeared, that six or seven letters directed for Lisbon, had also been concealed during the chase. They were never delivered up, nor mentioned, until such examination, when we find, unaccountably, that those letters do not relate to the Tulip, or her cargo; and that neither in them nor any other paper on board (though the ship, as well as the cargo, were to be sold by him), is the supercargo, who was going a perfect stranger to Lisbon, introduced, recommended, or named!

The messenger and despatches were captured on board of the Tulip. But the supercargo and the captain do not precisely agree, as to the plan originally contemplated for disposing of them. It must, however, be inferred, from what both have said, that, even if the Tulip was forbidden, by her owner, to enter or touch at any English port, for the purpose of landing the messenger with the despatches, she was to put them on board of any vessel proceeding to England, which she might casually meet; and if, in her direct course for Lisbon, she did not meet with a vessel proceeding for England, she was to sail to the Lands End (many degrees of latitude and longitude out of her direct course) and lie off and on there, until she found a vessel going into port. The envelope directed to Shaw and Carroll of Dublin, contained, most assuredly, the only papers exhibited in relation to the cargo. It is alleged by the claimant, that those papers were to be produced only in case the vessel should be carried into a British port. If the envelope and its contents, had been at their date (before the cargo, let it be noted, was all shipped) calculated as a mere cover; it was an unnecessary measure, after the passport, which would supersede all necessity for producing these papers in a British port. American papers were, then, the only documents the cargo required; if it were bona fide American property. I take no notice of the contents of a paper said to be signed by the captain of the Tulip, Cleeland, and Braine, after the capture. It cannot have the authority of a paper found on board at the time of capture; it is not proved on oath to have been signed; nor could it have been competent to prove the facts therein stated. It is contradicted, in its principal allegation, by the oaths of Braine and Funk; and could only be used to discredit their testimony.

Some animadversion has been made, by the advocate for the captors, on a short letter from Mr. Sampayo at New-York, directed to Mr. Sampayo at Lisbon, found on board the Tulip. There is no intrinsic evidence in this letter, that it relates to that vessel or her cargo. The external circumstances alleged to be grounds of suspicion, are not proved or judicially known to the court.

The claim of William Shaw, and an affidavit annexed, state, that he is a naturalized American citizen, resident in New-York, as a merchant, since 1795. That the lading of the brig (whereof he is the sole owner, as well as of the cargo) commenced on the 10th of June, and she was destined for Lisbon and no other port, and he had not since changed her destination, or that of her cargo. The supercargo had express orders to proceed to Lisbon; and not to touch on any account, at any port, or place, in Great Britain or Ireland. That, for the purpose of protecting the vessel and cargo from British capture; and for no other purpose, on her voyage to Lisbon, he received, from H. Barclay, son of the British consul, "a letter from Augustus J. Foster, lately the minister plenipotentiary of Great Britain near the United States; intended as a protection from British capture; and agreed to take on board one or two passengers; and to land him or them in England; provided the deponent's vessel, either in the course of the voyage, or off the Lands End, whither she was to go in case of necessity, should find a vessel bound in to England." If no opportunity (a vessel going in) occurred off the Lands End, the Tulip was to proceed directly for Lisbon; with the passenger or passengers. He states, that his so proceeding to Lisbon had it been necessary, was not objected to by Mr. Barclay, the British consul, on condition of his "forwarding the said passenger or passengers from thence to England, at his own expence." He states, that the letter to Shaw and Carroll, and the endorsed bill of lading, were intended to enable them to protect the property if carried in to a British port. "But the said deponent, at the same time, instructed the said supercargo, not to show either the said letter, or bill of lading, until the said brig and cargo should be actually captured, and carried in by a British vessel." That he was ignorant that the Tulip had on board any letters for England or Ireland (other than those enumerated) "except such as the said Augustus J. Foster should deliver to the said passenger or passengers, at New-York." He declares his ignorance of any letters being put on board for Lisbon; and if any were so put on board, even by Mr. Foster, they so were without his consent or privity. He repeats, that the sole destination was for Lisbon; where the supercargo was instructed to sell both vessel and cargo; and to invest the proceeds in bills of exchange, for the deponent's account. That he insured the brig and cargo for the Lisbon voyage alone. That neither the British government, nor any subject of that government, or any person inhabiting within the territories thereof, nor their factors nor agents, had or now have, any right or interest in the brig, or her cargo. A great number of letters for England, were found on board the Tulip, after her capture; but they did not relate to her, or her cargo.

The passport contains, in itself, ample evidence of the most essential fact, on which I

shall found my opinion. This document is sufficient, in my view of the subject, without travelling into the contents of the despatches themselves, whether innocent or noxious. Much less is it necessary, minutely to attend to the speculations of the claimant's advocates; who, without having seen them, claim the right of contradicting (as decorously as such a circumstance will, with any tolerable appearance admit) my statement. Thus calculating, ineffectually here, to induce the spreading the despatches on the minutes; or excluding them entirely from the notice of the court. These speculations extend to the groundless, and, considering the character of the minister, and the circumstances of the case, highly improbable supposition—that the packet might contain nothing inimical or noxious. Probably, as is surmised, it is mere blank paper! to give a colour to a collusion between the claimant and minister, for covering this cargo. Not a very favourable aspect in which to place either the minister or their client! or even the ownership of the cargo. But I should not be so exacerbated by the rage of war, as to presume the minister capable of such conduct; especially in an object so small; if I did not possess the means of proving the contrary. See 6 C. Rob. Adm. (Am. Ed.) 465. The minister declares in his passport;—"it becomes indispensably necessary" (and necessity is too often, state morality) "to forward despatches to his majesty's secretaries of state." Can any reasonable mind seriously presume, that these despatches were not, to them important; and, of course, to us, hostile and noxious? Is it within the compass of the most ardent credulity (I say not credibility) to believe, that the minister's envelope enclosed entirely innocent matter? or—what is more fanciful—blank paper? and that in charge of a messenger! Would a public minister prostitute his own, and the official characters of "his majesty's secretaries of state," for the petty and sole purpose of covering or protecting, a cargo—trifling indeed, to induce the sacrifice? And that, when the same object, for an innocent voyage to Lisbon, could have been effected, without such dangerous and unlawful pretexts?

I shall not, extensively, indulge myself in controversy about the legality (common law legality applied in a prize court!) or the "novelty" of the mode I took, from necessity, to certify an extract of part of the contents of a despatch; and to announce the import of the subjects of it. I am not myself prepared, confidently to declare, what mode is the most proper. One of the advocates, who is greatly dissatisfied with my mode, will suggest, or tolerate no other. He will have no middle course. The whole must be developed, or totally excluded. Another would submit to the judgment and certificate of the secretary of state, both as to state policy, and noxious character: but inhibits the judge—although the law expressly assigns to him the receipt of, and power over the papers—from all discretion, or instrumentality, in this part of the case. Now (however mistaken I may have been as to my mode of placing the facts among the exhibits) it would seem to me, that, in some way or other, the judge who is to determine the cause, should have an opportunity of seeing and deciding whether or not, any, or what part of the despatches were indispensably necessary to the justice of the case; and maugre this interdiction of the learned advocate, and throw myself out of the question, he seems to be exactly the character, who ought to be best qualified to form a just opinion on the subject; either of relevancy or necessity of development. No doubt, should the secretary of state, hereafter, certify, in the manner this worthy advocate would approve; we should hear, from some other, a variety of objections, which it does not become me to mention or surmise. It has, too frequently, fallen to my lot, through a period of more than 20 years past, to take the first step on to us, new, and often embarrassing points. It is not my habit to be overweeningly attached to my own modes, or opinions. But it is my habit to decide, and to act as it appears to me right at the time; and that as promptly as the case demands; leaving the dissatisfied party to his remedy in a superior tribunal. There is a protest to the extract from the despatch, and my certificate of its import. This was much desired by me, and I am gratified in the hope, that a superior tribunal will give explicit instructions in what manner I shall hereafter proceed, if similar circumstances (not likely to be frequent) should again occur. Whether this mode or any other, be settled by those to whom I look for correction of my errors, is to me immaterial. Common law principles, and rules of evidence cannot be applied in a prize court. Its proceedings are totally different from those of any other court. Proofs and evidence are from necessity and the nature and exigencies of cases here permitted; which would be at once rejected, not only in courts of common law, but on the instance side of this, or any other admiralty court. It is only on account of the novelty of this part of the cause, in this country, and by no means induced by any thing relating to myself, that I add to the foregoing observations. My leading object is, to obtain a direction for future government under such circumstances.

I abstracted, from the mass of papers delivered to me, the despatches of Mr. Foster, and sent them, with the seal of the envelope unbroken, through the law officer of the district (the usual organ of communication with the executive) to the secretary of state. This I did under my own view of its propriety; and without adverting, at the time, to the constant practice in other nations. In England and France, it is always customary. Those nations, unhappily for themselves and all the world, are the best ac-

quainted with the horrible trade of warfare, having been, through ages with short intermissions engaged in it. Finally their bitter and endless collisions have involved us; and we have, in our new situation much to learn. Both have alternated friendship and enmity with us, at different periods of our national existence. But I do not, on the latter account, disregard all their established practice in prize proceedings. Fas est et ab hoste doceri. In both England and France communications are, and have been through a long course of time, made by their executives or their ministers, to prize judicatories (Marr. Dec. in 1776; 6 C. Rob. Adm. 444; Code de Prisis, 1778, p. 705), as well of the fact of captured despatches (always sent to some executive department) as of their tendency and import. Our act of congress directs, that all papers found on board a prize, shall be delivered, on oath, to the district judge; as with him, and in the court in which he sits, all prize proceedings must originate. But the despatches, in extenso, are never, in any country developed in prize courts. How this is to be regulated in our courts—let the supreme courts, or the legislature, direct. The secretary of state transmitted to the attorney of the district, not as proctor in this cause, but in his capacity of law officer of the district, an authenticated copy of the despatch from which I made the extract, and certified its import. It was accompanied by a request, that it might not be made public; unless I should be of opinion, that the justice of the case so indispensably demanded its publicity, as to overbalance the policy and interest of the government and nation. I was not of that opinion, but placed among the exhibits, the extract objected to, it being the only part in any wise directly relating to the cause. I would not require the whole to be spread on the record; not only because I did not deem it essentially necessary, but because I would not establish a precedent, which if followed, might in some future case (however it might be in this) involve and injure the interest of the nation, to which those of individuals must ever give way. The judiciary of this country, being a co-ordinate branch of the government, is peculiarly bound to be attentive to the safety of the nation, on such points; and more especially in courts whose jurisdiction rises out of, and is employed exclusively in the incidents of war. If the superior court should deem the despatch, or the copy of it, essential in the cause, it is ready to be produced. As to the argument of the claimant's advocates, that they should have the opportunity of discussing its contents, showing its innocence, and refuting the imputation of noxious character;—I feel warranted in saying—that great national objects must prevail, over such minor considerations. Nor do I conceive the despatch (which, however, cannot but be believed to be calculated to serve the interests of the

British government and not ours) of so much importance in this cause, as the example would be mischievous, on some future occasion. Our own citizens may easily escape any difficulties on this account, by avoiding all instrumentality in such business. Let it be remembered too, that the noxious quality of the despatch is only an aggravation of the offence; whereof the placing the vessel, for any unlawful purpose in the service of the enemy, is the gist and substance. True it is, as has been observed by the advocates for the claimant, that intelligence may be conveyed through a multitude of ordinary channels; but that going directly from or on plans suggested by a public functionary, especially if attended with the solemnity of a messenger, could not fail to be, in a ten fold ratio, regarded. It appears, in this case from Mr. Foster's passport, that ordinary means were not in plenty; for he declares "no ordinary conveyance could be procured." It also appears, that he would have preferred such means; as he avers that the employment of this vessel arose from "an unpleasant necessity."

I am not inclined to say (but I give no opinion on any point, save that immediately before me) that a passport unaccompanied with unlawful conduct, protecting the vessel in this case, if the cargo be really American, from British cruisers, would have been as to us, cause of capture and condemnation; however it might have exposed her to the risk of being made prize of by other enemies of Great Britain. Passports from a belligerent to neutrals (or possibly to our ships even now, when we have changed our neutral character) to proceed unmolested, from one lawful port to another, may not be considered as illegal; if not tainted with unlawful conduct or conditions. It is not unprecedented for a belligerent to exempt even enemy ships engaged in a particular trade, beneficial to such belligerent, from capture by its cruizers. It is yet lawful for us to trade with Portugal and Spain, with cargoes bona fide American property. If all our ships in this trade laden with cargoes belonging to our own citizens, were exempted from capture by the British, I do not now see, that we should have the right of condemning them as prizes to us. But when particular vessels are indulged with such exemptions, it creates suspicion, at least as to cargo. This has caused much animadversion in this case, and in all such cases clear proof is required to repel the fraudulent appearance. Simulated papers are not, in themselves, causes of condemnation; though they throw the proof on the claimants; and carry with them strong suspicions of fraud. This vessel and cargo were insured, and should have been documented, as American property. It is on this score, strange that no papers as to cargo, but those sworn by the claimant to be simulated, should be found on board. If he was justified in covering, to delude the enemy, he

certainly should have contemplated the risk of capture by us. Incidit in Scyllam, cupiens evitare Charybdem. The solitary bill of lading, and that not in possession of the super-cargo, offered to be proved to have been delivered to the lieutenant of the Atlas by the captain of the Tulip, even if the proof had been admitted, seems but slender evidence of bona fide American property. The captain generally retains one of the bills of lading for his own purposes. This has no operation, as to proofs of property, one way or another.

I am not now necessarily bound to determine whether the law of the 6th July embraces this case, or subjects the person and property of the owner to its forfeitures and penalties. If they even are so subject, they are not exempted from the laws of nations, when those are violated. I cannot agree in the doctrine insisted on, "that the claimant is only amenable to this law of our own country; and if that does not reach him, or his property, both are free from the operation of any other." It will be with more consideration than I think it necessary now to give the question, before I determine how far the prize jurisdiction, without special authority in penal acts of the legislature, applies to forfeitures accruing under our municipal laws. The law of the 6th July, only interdicts licenses to trade to a British port. It obliges vessels to give certain bonds, before clearance and departure. The Tulip was lawfully cleared; the law not being, nor could it be known to either the claimant or the collector, at New-York, before the clearance was given. As to questions of trade with enemies, I will meet them, when they come directly before me. Possibly I may have to decide such questions in chief, and I do not choose, incidentally, to give an opinion. Bynkershock (Duponceau's, 23, 4) clearly states—"But although trading with the enemy be not specially prohibited, yet it is forbidden by the mere operation of the laws of war." He had before said, that most nations forbid such trading, either in their declarations of war, or by special laws or edicts. I notice this merely to show, that in the opinion of this justly celebrated jurist, such municipal laws were only cumulative prohibitions, re-enactments or additions to the law of nations; which would have been competent without them. In this light, I consider the law of the 6th July, in this case. Nor can I agree with the claimant's advocates, that a citizen, to certain intents, may not be considered and treated as an enemy. Municipal laws, it is true, may cumulatively, for offences against the law of war, operate personally and also on property within our territory. But both person and property are still subject to the laws of nations. The admiralty law operating in its proper tribunal, is peculiarly applicable to property within its jurisdiction; and when that is rightfully employed on subjects of prize, it is emphatically, a court of the law of nations, in whatever place or country it sits. The technical definition of "enemy," given by one of the advocates for the claimant, would do well for a philologist; but here it is more ingenious and learned than solid. A neutral violating his neutrality, is separated by his own misconduct from the character of his nation; and becomes individually an enemy. A citizen of a nation at war, lending himself or his property to the service of the enemy (see [W. B. v. Latimer] 4 Dall. [4 U. S.] Append. 3), becomes pro hac vice, and his property (though it may not be really or nominally, enemies' property) is subject to all the consequences. It is contrary to his allegiance, which is part of the law of nations; and there is no distinction, in this respect, between native and adopted citizens. He violates the obligations imposed on him by his allegiance when he affords service or assistance to the enemy, in any unlawful case. Conveying intelligence is accounted the most mischievous and unlawful attribute and concomitant of trading with the enemy. 2 C. Rob. Adm. 69. I should hold the opinions whereof my decision is the result, upon principle, if no decided case could be found. But see the case of The Hoop, 1. C. Rob. (Am. Ed.) 196, and particularly the note 184; Dup. Bynk. 157; 8 Term R. 561; 1 Term R. 185, Sr. Leon. Jenkins' Introd. 86, 92. And also see Sir W. Scott's definition of "Despatches," and his reasoning as to the nature of them. 6 C. Rob. Adm. 465.

I know of no case of service to an enemy, acts of humanity excepted, which is not unlawful. Modern warfare permits (as it does not though practised) offices of civility, between enemies. Bynk. 1. P. e. 12, p. 95. "Les offices de civilite ne sont pas incompatible avec les devoirs de la guerre." But acts of benevolence and offices of civility, are very different from services which assist in the operations of war.

The foundation of my decree is; that this vessel was, at the time of capture, with the knowledge of, and under contract with the owner, undeniably, in the service of the enemy; carrying despatches of a public nature, sent under the charge of a messenger, from a British minister, to his government, during open and declared warfare, between this country and Great Britain and Ireland; in violation of the duty of allegiance in the owner. Whether the service in which she was engaged was to be performed, by actually going into a British port or by trans-shipping the messenger and despatches at sea, is in my contemplation of the subject, immaterial. For this reason, I have passed over, in the statement, the circumstance of the capacity of the British pilot Cleeland to place the vessel in a safe and convenient situation for landing himself and a servant of Mr. Foster's, who was on board, at an English port, or place. Neither the pilot, nor the servant, could have contemplated a passage to England by the way of Lisbon. Trading with an enemy at sea, is equally

illegal, with so trading in port. Conveying intelligence, stands on the same principle, and subjects the vehicle employed, to capture as lawful prize. The cargo, if belonging to the owner of the vessel so employed, with his knowledge and by his express agreement, in committing the offence is confiscable ex delicto. "Si sciverit, ipse est in dolo." And the "scienter" of the owner in this case, is incontrovertibly proved. If it be enemies property, it is confiscable ex re, so that, in either case it appears to me to be lawful prize of war. On this view of the case, were I inclined to order further proof, on the claim of American ownership, it would produce no favourable result.

I have been compelled by a long discussion, often embarrassed with matter not necessarily belonging to it, and too much protracted to dilate on this subject so much more than I intended, that I do not pointedly notice all the authorities which, I think, fully support my opinion. In the case of The Atalanta, 6 C. Rob. Adm. 440, much information, on the subject of unlawfully conveying public despatches, will be found. Every thing there said to condemn the conduct of a neutral, applies, with double force, against the act of a citizen, in such a case. The ground of decision in the case of The Atalanta is not laid in the obnoxious British doctrines of colonial trade; but the importance of a colony to the mother country, is mentioned as an ingredient, to show the enormity and injurious tendency, of the offence. Nor is the judgment founded merely on the fraudulent conduct of the neutral; though that is also an ingredient; which, whatever there may be in this case of a similar nature, I have avoided introducing with any stress. The illegality and inimical conduct of the neutral in carrying enemy despatches, is by Sir W. Scott pointedly relied on. A neutral may carry despatches from a minister resident in his country, be the nature of them what it may, to the ports of the belligerent in the country to which the minister belongs. If the neutral is stopped on the high seas for search all he has to do, is to act candidly; and deliver the despatches to the enemy of the minister's government; which those who use such conveyances must expect. 6 C. Rob. Adm. 454. But concealment and mala fide conduct, are taking part with the enemy, and subject the neutral to the penalties inflicted by the laws of nations. Very different is the case of a citizen, whose country changes its state of peace and neutrality, to that of war. No service afforded to an enemy, as to despatches, or other assistance, can be justified. Delivery of the despatches, on capture, without even an attempt to conceal them, does not purify the original act, which was illegal ab initio in the citizen; though it might have been otherwise in the case of the neutral. If there be not a decision directly to the point of this case, I hesitate not to apply old principles to new circumstances. I agree in the reasoning of Sir W. Scott, on this subject. Although all his opinions are not in unison with our sentiments (nor in some important instances, are those of English common law judges) it would be illiberal and uncandid, to deny him the meed of great talents, sound sense, and a thorough knowledge of the laws of nations. I do not follow his decisions or opinions, as binding authorities. But his decisions are luminous guides, where they are not not warped by the executive edicts, or by the prejudices arising from inveterate state policy; which too often tarnish the character of the court in which he sits, and render it, when operated upon by them, no longer a tribunal governed by the laws of nations. He does not, however, stand alone, in supporting the principles which have directed my judgment. I do not reject the fact of noxious despatches. They are not, it is true, spread on the minutes, communicated in extenso to the claimant's advocates, or proved in the way they deemed exclusively proper. Yet the tendency and character of them are sufficiently unfolded for all the purposes of justice. I rely on the unlawful service, incontrovertibly proved by the minister's passport; to the evidence whereof no objection has been, or can be made; as the principal ground of decision, though both grounds are, in my opinion, sufficiently tenable. The claimant's own acknowledgment, on oath, would be competent proof, did not the passport, on its face, bear ample testimony, of the fact of employment in enemies' service. If I am mistaken, in this new course, which the unhappy contest we are now commencing has thrown upon me; my errors either in form or substance, may be corrected, on appeal.

Much complaint has been made, as to the form of the libel—the deficiency of the interrogatories—and conduct in the examination of witnesses. The libel I do not think objectionable, though it might have been in another form, as to the parties libellants. The interrogatories are sufficient to produce the facts necessary in the cause. The proceedings at the examinations in preparatorio, passed, for the most part, under my own observation. I saw nothing improper, or reprehensible. Experience will teach us what alterations, or additions are necessary, in or to any of the proceedings, and I shall always be ready, in future cases, to listen to her lessons; aided by the suggestions of the gentlemen of the bar; including, very desirably, the learned advocates for the present claimant.

As I now conceive both the facts and the law of this case, my duty imposes on me the unpleasant task of condemning both the vessel and cargo, as lawful prize, according to the prayer of the libel.

From the decree of the judge of the district court, an appeal was entered to the circuit

court of the United States for the third circuit Pennsylvania district. and the case was fully and most ably argued for the claimants by Messrs. Binney and Hopkinson, and by Mr. Dallas for the captors. The decision of the district judge was confirmed by his honor Judge Washington, and from the circuit court no appeal was made.

2 [Binney and Hopkinson, objected to the sentence of the district court—1. Because the despatches themselves had not been made exhibits in the cause, so as that the claimant might have an opportunity to show that they were not of a nature to impute a crime to the owner in carrying them, but that the judge had, in lieu of them, filed a certificate, stating that they did communicate important information to the enemy. 2. That admitting the conclusion of the judge, as to the purport of the despatches, to be correctly drawn, still, it was no cause of condemnation in a prize court. They contended, that the offence of a citizen trading with the enemy, or conveying information to them, is punishable only by the municipal law, on the ground of a breach of his duty of allegiance to his country, with which the law of nations, the only rule of correct decision for a prize court, has nothing to do. They cited the following cases: 4 C. Rob. Adm. 210. 215; 6 C. Rob. Adm. 344, 420, 430, 456. 465; Doug. 613, 594; 1 Coll. Jurid. 130. 134, 152; 2 C. Rob. Adm. 64; Bynk. 24, 167; [W. B. v. Latimer] 4 Dall. [4 U. S.] Append. 4; Act Cong. July 6, 1812 [2 Stat. 778].

[Dallas, for the appellees, endeavoured to show from the papers that the cargo belonged to Shaw & Co. of Dublin, in whose favour the bill of lading was made out. He resisted the arguments on the behalf of the appellants, as to the jurisdiction of this court to condemn in a case of this kind, as prize, and cited the following cases: Marr. Dec. 3, 143, 247; 6 C. Rob. Adm. 127, 341, 350. 403, 405, 406. 440. 444. 458, 460–463; 6 Term R. 527; Bynk. 23–25; 2 Valin, Comm. 31; Sir J. Jenkins. 86. 92; 2 Brown, Civ. & Adm. Law, 249, 331: 1 Marsh. 85; 1 Term R. 85; 1 C. Rob. Adm. 106. 138, 165, 177, 208; 4 C. Rob. Adm. 8, 65, 69, 72, 206, 210. 215. 233; 8 Term R. 550, 554, 555, 560; 1 Bos. & P. 347; 4 Bl. Comm.; 3 C. Rob. Adm. 25, 34. 294; 2 C. Rob. Adm. 59, 64; [Maybin v. Coulon] 4 Dall. [4 U. S.] 298; [Duncanson v. M'Lure,] Id. 308; 1 Bin. 110.

[Washington stopped Mr. Dallas in that part of his argument in which he was endeavouring to prove that the cargo was enemies' property, observing that, if the cause should turn on that point, he should not decide it without further proof; the evidence to prove the property to belong to the claimant being very strong, though there was some obscurity in relation to the bill of lading.

[After Mr. Dallas had progressed in his argument, and had concluded his observa-

tions in respect to the despatches, the court directed the letters from Mr. Foster to Lord Castlereagh to be delivered to the counsel for the appellees, to be filed in the cause; observing that if papers of this kind can properly be kept back by the government or the judge, upon principles of state policy, and their import, as it strikes the judge, be substituted in their room (as to which no opinion is given or even formed) in this case there appears to be no necessity at this time for withholding them from the counsel for the appellants.] 2

WASHINGTON, Circuit Justice. I have perused with attention, the papers, and the authorities, which have been exhibited and cited, in this cause; and I proceed, with perfect satisfaction, to pronounce an affirmance of the decree of the district judge. Trading with an enemy, was an offence against the maritime law, long before the American Revolution; and, as far back as the records of the English admiralty can be traced, it appears incontrovertibly, from a series of direct and uniform decisions, that the vessel and cargo of a subject, taken in the act of trading with an enemy, were liable to condemnation, in the prize court, as prize of war, to the captors. The principle which prohibits trade and commerce with the enemy, exists therefore, independent of those opinions and judgments, which have been pronounced by Sir William Scott, subsequent to the Revolution: and to that principle I should resort, on the present occasion, with complete confidence, although no adjudged case in point could be introduced. If trade and commerce with the enemy are unlawful, carrying the public dispatches of the enemy (the worst kind of commerce with the enemy) cannot be lawful. The same principle of the maritime law, which makes that species of trading, which consists in the mere intercourse of buying and selling, an offence; with stronger reasons, for the public safety, must condemn the act of conveying intelligence to the enemy. The argument from analogy is irresistible. I repeat, independent of all authority. Nor is it an adequate answer to this course of reasoning, that the offence committed by a citizen, in carrying the dispatches of the enemy is an offence at common law, or by statute. The same may be said of trading in the strict sense with an enemy, which is unquestionably, a misdemeanor at common law. In both cases, the offender may be prosecuted personally; and, in both cases, the offending vehicle, if taken in the unlawful act, may also be condemned as prize of war. In neither case, does the condemnation proceed on the ground of the party being actually an enemy, nor of the property being actually owned by an enemy; but in both cases, the party acts as if he were an enemy; and,

therefore, the maritime law, treats the property, as if it belonged to an enemy.

[There is no difference as to jurisdiction, or the right of confiscation, between the two cases, except that the offence of carrying despatches to the enemy is most dangerous. The despatches in question contain information respecting the state of preparation in which the United States were, in respect to our navy; the force of our frigates; the disposition of our government; and contains a recommendation to the British government, as to sending a fleet to the American coast.] [2]

Upon the whole, I do not think it necessary to go into a further detail of the grounds of my judgment, as I have not the slightest doubt upon the case. Let the decree of the district court be affirmed.