## Case No. 11,575.

### The RAPID.

[Cited in Judd Linseed, etc., Co. v. The Java, Case No. 7,559. Nowhere reported; opinion not now accessible.]

## Case No. 11,576.

### The RAPID.

[1 Gall. 295.] [1]

Circuit Court, D. Massachusetts.   Oct. Term, 1812. [2]

PRIZE—TRADE WITH ENEMY—PROPERTY IN ENEMY'S COUNTRY—FORFEITURE—CAPTURE.

1. During war all trade with the enemy, unless by permission of the sovereign, is interdicted, and subjects the property engaged therein to confiscation.

[Cited in Caldwell v. Southern Exp. Co., Case No. 2,303; Planters' Bank v. St. John. Id. 11,208; U. S. v. One Hundred Barrels of Cement, Id. 15,945.]

[Cited in Beach v. Kezar, 1 N. H. 186; Perkins v. Rogers, 35 Ind. 145.]

2. A citizen of the United States has not a right to withdraw his property, acquired before the war, from the enemy's country, after he has full knowledge of the war, without the permission of government.

[Questioned in Kershaw v. Kelsey, 100 Mass. 566.]

3. If a vessel be sent from the United States, after knowledge of war, to the enemy's country, to withdraw such property, the vessel and the cargo are confiscated jure belli.

[Cited in Chauncey v. Yeaton, 1 N. H. 156.]

4. The property of citizens taken trading with the enemy is considered as quasi enemy's property.

[Cited in Tait v. New York Life Ins. Co., Case No. 13,726; U. S. v. One Hundred Barrels of Cement, Id. 15,945.]

[Cited in brief in Sands v. New York Life Ins. Co., 50 N. Y. 628.]

5. If property, forfeited to the United States by a breach of the non-importation act of 1st March, 1809 (chapter 91), be captured in a trade from an enemy's port to the United States, the captors are entitled to it, and the United States cannot claim it on averment of the antecedent forfeiture.

[Cited in Donnell v. Jones, 17 Ala. 689.]

[1] [Reported by John Gallison, Esq.]
[2] [Affirmed in 8 Cranch (12 U. S.) 155.]

This was a prize allegation against the schooner Rapid and cargo. The facts of the case, as they appeared in the papers and preparatory examinations, were as follows:— That the schooner was enrolled and licensed for the cod-fishery, at Boston, on the 23d June, 1812, by Ebenezer Perry, as owner and master. That the schooner sailed from Boston for Eastport on the third day of July, 1812, having Mr. Jabez Harrison, the claimant, as a passenger, on board. That from Eastport the schooner proceeded to Indian Island, a British settlement within the province of Nova Scotia, where the property in question, to wit, seven boxes, one trunk, and two bales of goods, of English manufacture, were taken on board, as the property of Harrison. That the schooner sailed from Indian Island with said cargo, on the 7th of July, 1812, destined for Boston, or any other port of the United States that could be conveniently reached. The claimant in his affidavit admitted the substantial facts, and alleged, that the property was purchased before the war; and that he was a native citizen of the United States, and entitled to restitution accordingly. At the time of the schooner's departure from Boston, the declaration of war was fully known to all parties concerned in the voyage. The United States also interposed a claim for the goods, as forfeited for a breach of municipal law.

Wm. Prescott, for claimants, moved for further proof, in order to show, that the claimant's object was to withdraw the goods from the possession of the enemy.

Pitman & Cummings, for captors.
Wm. Prescott, for claimants.
G. Blake, for the United States.

STORY, Circuit Justice. Further proof is ordered, only when some doubt or question arises upon the case, as it is disclosed by the preparatory examination. If this examination shows a clear case of condemnation, no motion for an order of further proof will be sustained. The motion for further proof cannot be preliminary. The whole cause must be first argued on the facts, as now disclosed. If, after argument, the court think proper, they will then grant an order for further proof.

Mr. Pitman, for captors.

1. The claimants have violated the municipal laws, and the property is thereby made good prize. The Walsingham Packet, 2 C. Rob. Adm. 77. 2. It is good prize, as having been engaged in trade with the enemy. 1 C. Rob. Adm. 165; 4 C. Rob. Adm. 78; 5 C. Rob. Adm. 265; Id. 224.

Wm. Prescott, for claimants.

1. All the condemnations as prize, for trading with the enemy, are founded not on the public law, properly so called, but on the public law as enlarged in modern times by special ordinances. Neither Grotius, Puffendorf or Vattel, speak of such a trading, as a cause of forfeiture to the captors. Bynker-

shoek, it is true, does speak of it, and Sir W. Scott bottoms himself on Bynkershoek. 2 Valin, Ord. 32; 1 Emerig. 128; Le Guidon, c. 2; Lee, Capt. 60, 61; Marten, Law Nat. 318. There can be found no English case of property captured at the beginning of a war. There is, by the public law, a right to withdraw property from the enemy, within a reasonable time after hostilities commence. It is therefore no trading with the enemy. In treaties, a time for this purpose is often stipulated, in affirmance of the law of nations; as in the 20th article of the treaty between the United States and Great Britain, the 18th article of our treaty with Holland, the 22d of that with Sweden, the 23d of that with Prussia, &c. The cases cited on the other side are those trading with the enemy flag, and very different from the present. 5 C. Rob. Adm. 265; 4 C. Rob. Adm. 78; Id. 96; Potts v. Bell, 8 Term R. 557; The Madonna delle Gracie, 4 C. Rob. Adm. 195; The Harmony, 2 C. Rob. Adm. 325 (Bowden's Case); The Ocean, 5 C. Rob. Adm. 91; Bell v. Gilson, 1 Bos. & P. 345.

2. As against all but the United States, this vessel and cargo belong to the claimants, if any municipal law has been violated. The decision in the Walsingham Packet is not law here. A prosecution under the revenue laws in rem must be in the name of the United States; here the suit is in the name of the captors. The libellants do not pretend to claim, as well for the United States, as for themselves. In England such prosecutions may or must be in the name of the seizing officer. In The Walsingham Packet, the process was in the name of the king, and the condemnation was, not to the captors only, but to the king, as well as to them. This process being dismissed, the property will remain in the marshal's hands, to abide the issue of the claim in behalf of the United States.

Mr. Pitman in reply to Mr. Prescott.

It is clear from the evidence, that here has been a violation of the 5th and 21st sections of the coasting act; and also of the non-importation law; and that the vessel having sailed to, taken in a cargo at, and sailed from, an enemy's port, after notice of the war, the law of nations, which prohibits all trade and intercourse with enemies, subjects the vessel and cargo, as prize of war, to capture and confiscation. The claim of Mr. Harrison should be rejected in limine. The property having been confessedly captured, while in the violation of the laws of the United States, he can have no standing in court. But it is contended, that the captors had no right to seize for a violation of municipal law, and that therefore it is sufficient for the claimant to show property in him, in order to entitle him to restitution. In answer to this, it is sufficient to refer to the language of Sir W. Scott in the cases of The Walsingham Packet, already cited, and The Cornelis and Maria, 5 C. Rob. Adm. (Am. Ed.) 32.

Should the court however be dissatisfied on this point, still we contend, that the property should be adjudged to the captors, on the ground that the evidence clearly shows a case of trading with the enemy, and that the proof sought to be introduced would not alter its complexion. 1. The commencement of a voyage towards a country known to be hostile. is a sufficient act of illegality, to subject the property engaged in it to capture and confiscation. The Abby, 5 C. Rob. Adm. (Am. Ed.) 252; The Jonge Klassina, Id., 269; The Fortuna, cited in The Hoop, 1 C. Rob. Adm. 212. 2. The law of war forbids the citizen, under the penalty of confiscation, to lade a cargo at, or brig the same from, a port of the enemy, though purchased or contracted for before the war, though no outward cargo was carried, and though the cargo may be the proceeds of property shipped before the war. The Ringende Jacob, 1 C. Rob. Adm. 89; The Lady Jane, cited 1 C. Rob. Adm. 202; The Juffrouw Louisa Margaretha, Id. 203; The St. Louis, Id.; The William, Id. 215; The St. Philip, 8 Term R. 556. It has been said in behalf of the claimant, that by the law of nations. a trade with the enemy is not prohibited by the mere declaration of war, and that neither Grotius, Puffendorf, nor Vattel. lay it down as a general proposition, that commerce is prohibited between powers at war. This ground was taken by Heywood in 'Bell v. Gilson, but he was not therein supported by the court. It has been inferred, because particular ordinances of France and Holland specially prohibited such trading, that it would not have been considered in these countries illegal, without such special prohibition; but these ordinances may very justly be considered, as declaratory of the law, and for the removal of whatever doubts might have existed in some minds. It has also been said, that the opinion of Lord Mansfield was favorable to this position, but Lord Mansfield admitted in Gist v. Mason, 1 Term R. 85, that in the admiralty the trading with the enemy subjected the property taken therein to confiscation. See, also, Furtado v. Rogers, 3 Bos. & P. 197, 199. The allowance of time for the removal of property applies only to persons within the enemy's country upon the breaking out of the war.

With respect to the cases cited in behalf of the claimant, three of them turned upon the question of domicil; one was reversed in the king's bench upon an appeal, and the other, by being expressly an exception, establishes the general rule, for which we contend. The case of Bell v. Gilson was overruled by the case of Potts v. Bell. The case of The Harmony from 2 C. Rob. Adm. has no application to the present case. The Madonna delle Gracie, cited from 4 C. Rob. Adm. is the case, which proves the general rule, for which we contend, by being an exception to it. Sir W. Scott considered the circumstances of the case as virtually amounting to a license. If

it were justifiable, upon the breaking out of the present war, to proceed on a voyage from New York, without a license, to the island of Great Britain for the purpose of procuring British goods. which might have been lying there on American account, and purchased before the war, and to bring the same from Great Britain to the United States, then may the present voyage from Boston or Eastport to Indian Island. for the like purpose, and back to the United States, be justified, and not otherwise.

G. Blake, Dist. Atty., for the United States.

1. For a breach of the municipal law, the libellants are not entitled to forfeiture, as prize of war. Upon the violation of a municipal law, an absolute and indefeasible forfeiture accrues to the United States, except in the case of a bona fide transfer. Cruisers cannot usurp the rights of the United States, as to their revenue, by taking the place of the revenue cutters. Were this permitted, an injury would be produced to the citizen, for in case of seizure for a forfeiture, the onus is on the government; in case of capture, it would be different. If papers be found on board authorizing suspicion, the citizen is injured by being denied further proof. Case of The Hoop [supra]; The Nelly, 1 C. Rob. Adm. 220, note; The Walsingham Packet, 2 C. Rob. Adm. 77.

2. The libellants are not entitled upon the ground of a trading with the enemy. Non constat, as the case stands, without further proof that there has been any trading with the enemy. The transaction is capable of explanation, so as not to appear a trading with the enemy, though still an offence against the revenue laws. The government may be entitled to further proof for this purpose, although the claimant may not.

3. But if a trading with the enemy is sufficiently proved, yet the first forfeiture to the government takes place of the second to the captors. The non-importation act was not repealed by the war. and so the forfeiture was complete and absolute to the United States, to the exclusion of all captors. The rights of the captors jure belli, cannot supplant those of the government under its laws.

Mr. Pitman, in reply to Mr. Blake.

The captors are authorized by their commission to "detain, seize, and take all vessels and effects, to whomsoever belonging, which shall be liable thereto, according to the law of nations, and the rights of the United States as a power at war." The "act concerning letters of marque, prizes, and prize goods," gives to the captors all that they may capture in pursuance of their commission. If the property in question was subject to capture, according to the law of nations, or the rights of the United States, as a power at war, the captors are clearly entitled to it, by the grant of the United States. The offence against the law of nations was previous to the offence against the non-intercourse law; to wit, the going to Indian Island. But supposing the offence against the law of nations, and the rights of the United States as a power at war, and the offence against the municipal law, were simultaneous, the forfeiture of the property for both offences is to the United States; the capture was made under the authority of the United States, the captors set up no claim adverse to the United States, but claim under them, by virture of their commission and the prize act. Municipal laws, however, are confined to territorial jurisdiction; those of one nation have no effect within the territory of another nation. For any act done at Indian Island, no property could then vest in the United States, as forfeited for a breach of their municipal law. The right of the United States to property thus forfeited, cannot attach, or vest. until a seizure by the United States, or until the property arrives within their territorial jurisdiction; before such seizure, or arrival, the property in question was captured by the appellant, in pursuance of his commission, and vested in the captors by the law of the United States. Inasmuch as we claim not adversely to, but under a grant from the United States, and as a breach of a municipal law does not destroy the offence against the law of nations, nor the rights which accrue in consequence thereof, upon a capture as prize, but the lesser offence should rather be merged in the greater, the captors are entitled to the full benefit of their commission. and to all property duly captured under the same.

STORY, Circuit Justice. Two questions have been made, and very ably argued on all sides. 1. Whether a trading with the enemy be, by the law of nations, a ground for confiscation of the property engaged in it; and if so, whether the facts in this case constitute such a trading. 2. Whether, upon a prize allegation, the courts can notice a forfeiture for a breach of municipal law; and if so, whether the condemnation ought not, in that case, to be to the United States, and not the captors.

I will not take up time in considering the general question. After the elaborate dissertation of the learned Bynkershoek (liber i. c. 3), the able decision of Sir William Scott in The Hoop. 1 C. Rob. Adm. 196, and the judgment of the king's bench in Potts v. Bell. 8 Term. R. 548, upon the masterly argument of Sir John Nicoll, it must be considered as a settled principle of maritime and national law, that all trade with the enemy, unless with the permission of the sovereign, is interdicted, and subjects the property engaged in it to the penalty of confiscation. Nor do I consider this as a modern principle. It may not be found laid down in terms in Grotius, Puffendorf, or Vattel. but it irresistibly flows from the current of their reasoning. Indeed, the treatises of these great

writers upon national law are admitted to be imperfect on many maritime questions. War puts every individual of the respective governments, as well as the governments themselves, in a state of hostility with each other. All treaties, contracts, and rights of property, are suspended. The subjects are in all respects considered as enemies. They may seize the persons and property of each other. They have no "persona standi in judicio," no power to sue in the public courts of the enemy nation. It becomes in the highest degree criminal to comfort or aid the enemy; and if so, what more important aid can be afforded, than by succoring his necessities in trade, and warding off the blows aimed against his manufactures and commerce. It seems difficult, therefore, for a moment to sustain the opinion, that trade can subsist in a state of utter hostility. That contracts and credits can be valid, where they are liable to confiscation; and property may be passed, when it may be rightfully seized by the mere operations of war. From very early times, the principle seems to have been assumed, and acted upon, by almost all civilized nations, and the public edicts of sovereigns, prohibiting all commercial intercourse, can be considered in no other light, than as declaratory acts to warn their subjects against the effects of illegal conduct. See Vattel, bk. 3, c. 5; Id. c. 8; Id. c. 9; Id. c. 15; Grotius, lib. 3, cc. 4–7; Puff. Law Nat. bk. 8, c. 6, §§ 16, 17, &c.; Wolf. Just. Gent. §§ 1184, 1198; Marten Law Nat. bk. 8, c. 2, §§ 5, 6; 2 Valin, Comm. lib. 3, p. 31, tit. art. 3; Le Guidon, art. 5, c. 2; Cleirac, Coll. 117; 1 Emer. Assur. p. 128, c. 4, § 9; Lee, Capt. 61. I shall have occasion hereafter to show, that the rule, as to intercourse or trade with the enemy, forms a very ancient prohibition in the admiralty jurisdiction of Great Britain.

But it is contended, that even admitting the general principle to be incontrovertibly established, it does not apply to the present case; and it is argued, that a citizen of one country has a right to withdraw his property, acquired before the war, from the enemy country, provided he does it as soon as he can, after the commencement of hostilities; and further, that such a withdrawal is not a trading with the enemy.

If there be such an exception to the general rule, I should be glad to see it supported by some authority. It is not sufficient to show that the case may be of extreme embarrassment and hardship; for arguments of that sort are not properly addressed to a judicial tribunal; and if real, the difficulty may be completely obviated by a license from the government. Nor can it be inferred from provisions in treaties, which allow subjects of each nation a certain time to withdraw their effects from the enemy country, because such stipulations are but a waiver or relaxation of the right of confiscation of the sovereign, within whose dominions the property is situated. And I may be permitted to declare, that it would be dangerous in the extreme, to allow individuals, under the cover of such a right, to import all property from the enemy's country, which the ingenuity or the fraud of the party might clothe with the insignia of his own possessions. On the other hand, there is no inconvenience in allowing such rights to be exercised under the eyes and the protection of the government, and it can never be presumed in a court of justice, that the public councils will refuse their aid to the preservation of the honest acquisitions of their citizens. As little do the interlocutory observations of Sir William Scott in The Harmony, 2 C. Rob. Adm. 322, 325, The Citto, 3 C. Rob. Adm. 38, 39, and The Ocean, 5 C. Rob. Adm. 91, apply, even supposing they could outweigh his own deliberate judgment in The Hoop, 1 C. Rob. Adm. 196. In the first case, the single question was, as to the domicil of a neutral merchant found engaged in trade in the enemy's country, and how far the mere circumstance of residence should affect him with an enemy character. Sir William Scott says, "Suppose a man comes into a belligerent country at or before the beginning of a war, it is certainly reasonable not to bind him too soon to an acquired character, and to allow him a fair time to disengage himself; but if he continues to reside during a good part of the war, contributing, by payment of taxes and other means, to the strength of that country, I am of opinion, that he could not plead his special purpose with any effect against the rights of hostility." This was the case of a neutral, who was not directly affected by the war, and in respect to whom there was no duty of allegiance prohibiting trade, and no absolute national character already acquired. In The Citto the question was, whether Mr. Bowden, a British subject, had not by domicil in the enemy's country acquired a hostile character, so as to subject his property, engaged in a trade lawful for British subjects, to forfeiture. Sir William Scott said, "It does not appear, what has been the nature of Mr. Bowden's residence in Holland: whether he has confined himself to the object of withdrawing his property, or whether he may not have been engaged in the general traffic of the place; the court must therefore see more of the nature of his residence there. If he has confined himself to the purpose of withdrawing his property, he may be entitled to restitution." In this case the trade was innocent; the only question was, as to the national character of the party. The same remarks apply to The Ocean; the question was not, as far as any light can be gathered from the report, a question as to illicit trade, but as to mere domicil. And Sir William Scott said, "This claim relates to the situation of British subjects settled in foreign states in time of amity, and taking early measures to withdraw themselves on the breaking out of the war." "This gentleman (the claimant)

had been settled as a partner in a house of trade in Holland, but he had made arrangements for the dissolution of the partnership, and was only prevented from removing by the violent detention of all British subjects who happened to be in the territories of the enemy at the breaking out of the war. It would, I think, under these circumstances, be going further than the principle of law requires, to conclude this person by his former occupation, and by his present constrained residence in France, so as not to admit him to have taken himself out of the effect of supervening hostilities, by the means which he had used for his removal." That this case was not supposed to touch the principle of trading with the enemy after the war, I am more confirmed in the belief, by a note to it by Dr. Robinson, where he observes, "The situation of British subjects, wishing to remove from the country of the enemy on the event of a war, but prevented by the sudden interruption of hostilities from taking measures for removing, sufficiently early to enable them to obtain restitution, forms not unfrequently a case of considerable hardship in the prize court," &c. It is apparent, that he was here considering the effect of domicil on the property, not the nature of the trade in which the party was engaged; and he seems to consider, that measures for removal should have taken place previous to hostilities, in order to divest the party of his acquired national character, and enable him to resume his original character. And this is conformable to the decisions, where a party in itinere for his native country is declared to have assumed its character. The Indian Chief, 3 C. Rob. Adm. 12.

The Madonna delle Gracie, 4 C. Rob. Adm. 195, has been relied upon by the counsel for the claimant for the same purpose. But in my judgment, if it prove any thing, it proves that as to individuals contracting on their own private account before the war, there is no right to withdraw the property after the war, unless under the passport of government. The claimant in that case was a British consul, who had purchased the property in question for the British government, under a contract with them. Sir W. Scott said, "I certainly do not mean to weaken the obligation to obtain licenses for every sort of communication with the enemy's country, in all cases where it is practicable." "It would be a considerable discouragement to persons in such situations, at a distance from home, and employed in the public service, if they were to know, that in case of hostilities intervening, they would be left to get off their stores as well as they could, with a danger of capture on every side. The circumstances of this case may be taken as virtually amounting to a license, inasmuch as if a license had been applied for, it must have been granted." "On the whole I do not think, that by restoring this property I break in upon any one of the principles, which this court is bound to sustain, as against subjects of this government trading with the enemy." The bare statement of this reasoning shows the opinion of Sir W. Scott, that in general the withdrawing effects after the war would be an unlawful act, and that public policy supplied an exception and virtual license to property purchased for the use of the government.

The opinions of Mr. Justice Buller and Mr. Justice Heath, in Bell v. Gilson, 1 Bos. & P. 345, have likewise been cited. It is hardly necessary to combat their doctrines further than to suggest, that the decision itself did not meet the approbation of Mr. Justice Rooke, and was overruled upon very full consideration in the king's bench. Something has been intimated of the superior respect due to common law judges on account of their independence of station and continual employment in courts. In questions of municipal law, without doubt, their opinions are entitled to great consideration; but in questions of national and maritime law, I trust it is no want of decorum to declare, that their means of information are not so extensive, nor their habits of examination so accurate and satisfactory, as those of learned civilians, who have devoted their lives to the admirable science of the jus gentium. These are all the cases, which the known ingenuity and learning of the counsel for the claimants have been able to produce, in order to sustain a distinction, which shall except this case from the general law. If they have failed to support it, they have also failed to support the attempted definition of a trading with the enemy. In my judgment, it is not material to decide the technical meaning of trading in its ordinary acceptation, for I take it to be clear, that all communication and intercourse with the enemy is prohibited, and that it is nowise important, whether the property engaged in the inimical communication be bought or sold, or merely transported and shipped. The contamination of forfeiture is consummate, the moment that the property becomes the medium, or the object of illegal intercourse. I find it also laid down in the black book of the admiralty, as an offence inquirable in the admiralty, soit enquis de ceulx qui entrecommunent, vendent, ou achatent avec aucuns des ennemys de nostre seigneur le roy sans licence especiale du roy ou de son admiral. 1 Rought. art. 3, and note; Clerke, Praxis, Adm. 105. If however a trading were necessary, the same authorities which support the general rule, seem to me fully to decide, that the present would be deemed an act of trade; a trading is used in the sense of negotium, or negotiation. See Le Guidon, art. 5. c. 2. note.

But the distinction assumed in the present case is not left to the mere silence of authority. To be sure, that silence, in a class of cases that must have ordinarily arisen in every successive war of the last century,

would be pregnant with unfavorable presumptions. In the case of The St. Philip in 1747 (8 Term R. 556), the lords refused to give the claimants liberty to prove, that the goods, which had been captured and condemned as prize, were bought before the war, the chief justice (Willes) being clearly of opinion, that the effects of British subjects taken trading with the enemy are good prize. In The Juffrouw Louisa Margaretha (1781) 1 C. Rob. Adm. 203, 8 Term R. 557, but best reported in 1 Bos. & P. 349, note, the goods of a British merchant, purchased before the war, and sent away by the first favorable opportunity, were condemned equally with those purchased after the war. The reasons of appeal filed in that case by the respondents, (the captors,) contain a precise statement of the rule as to trade with the enemy, and the lords affirm the condemnation. In The Elnigheid (1795) 8 Term R. 559, 1 C. Rob. Adm. 210, corn which was shipped before the war with France, on British and Dutch account, on board a neutral ship from Rotterdam to Nantes, but which from accidental circumstances did not sail until afterwards, was condemned as prize. In a like case, The Freeden (1795) 8 Term R. 560, 1 C. Rob. Adm. 212, the claimants were permitted to show, that after the breaking out of the war they had used their best endeavors to avoid being implicated in the illegal traffic, but failing in the proof, the property was condemned. The two last cases are very strong to show with what strictness the rule is construed. The rule also has been applied to cases where there has been an interposition of a neutral port. 3 C. Rob. Adm. 22; 4 C. Rob. Adm. 79. The language of Sir W. Scott in The Hoop is indeed on this subject unusually bold and decided. After enumerating various cases, he says, "I omit many other cases of the last and the present war merely on this ground, that the rule is so firmly established, that no one case exists, which has been permitted to contravene it; for I take upon me to aver, that all cases of this kind which have come before that tribunal, have received an uniform determination. The cases, which I have produced, prove that the rule has been rigidly enforced, where acts of parliament have on different occasions been made to relax the navigation laws and other revenue acts; where the government has authorized under the sanction of an act of parliament a homeward trade from the enemy's possessions, but has not specifically protected an outward trade to the same, though intimately connected with that homeward trade, and almost necessary to its existence; that it has been enforced, where strong claims not merely of convenience, but almost of necessity, excused it on behalf of individuals; that it has been enforced, where cargoes have been laden before the war, but where the parties have not used all possible diligence to countermand the voyage, after the first notice of hostilities; and that it has been enforced not only against the subjects of the crown, but likewise against those of its allies in the war."

It is apparent also from the case of The Dree Gebroeders, 4 C. Rob. Adm. 232, with what jealousy the withdrawal of property from an enemy's country is viewed, when the party endeavors to claim the benefit of a neutral domicil. And in The Juffrow Catharina, 5 C. Rob. Adm. 141, in which the court deemed the party entitled to the benefit of the indulgence granted to cases, where there was no opportunity to countermand the shipment after the knowledge of the war, Sir W. Scott observes. "I wish it to be understood, that by this decree the necessity of obtaining a license is not in any degree relaxed. On the contrary, this court cannot sufficiently inculcate the duty in all cases for the protection of a license, where the property is to be withdrawn from the country of the enemy; it is indeed the only safe way in which the parties can proceed." With such authorities before me, founded as I think upon solid and national principles, I cannot say that the distinction assumed in the present cause is well founded. I must therefore hold that the facts of the cause prove a trading with the enemy, and of course subject the property to condemnation.

The view of the subject, which I have already taken, renders it unnecessary to consider the second question raised in the argument, although, as at present advised, I do not think, that it presents any intrinsic difficulty. Upon acknowledged authorities, in cases of trading with the enemy, the property has been uniformly condemned as prize to the captors. The Nelly, 1 C. Rob. Adm. (3d Ed.) 219, note. An application has been urged for further proof. But as the legal effect of the facts before me cannot, in my apprehension, be varied by any circumstances of excuse, or of purchase prior to the war, I feel myself bound to deny it. It would be but an useless delay productive of no benefit. I reject, therefore, the claim of Mr. Harrison. The United States, by the district attorney, have interposed a claim for the cargo, upon the ground, that it was forfeited in consequence of having been put on board with an intention to import the same into the United States, contrary to the act of 1st March, 1809, § 5, and that such forfeiture, being previous to the capture, gives the United States a priority of title. How this would be in case of the property of a citizen or a neutral captured and libelled as prize, under circumstances exclusively pointed to municipal forfeiture, I will not undertake to decide. It may also be questionable, whether the nonimportation act as to British ports is not, so far as respects citizens, suspended or swallowed up in the more extensive operations of the law of war. At any event I should not lightly touch a subject not necessary to my present decision, especially when it may involve so many delicate and important interests. But I think it no rashness to declare,

that that act can have no application to the case of public enemies or their acknowledged property; and if it had, the act granting letters of marque and reprisals has expressly given to the captors the full and entire property in all enemy prizes, and being later in date than the non-importation act, it must be considered, so far at least as concerns captures made by commissioned vessels, to be a waiver of the rights of the United States. The property of citizens taken trading with the enemy is considered as quasi enemy property. It is taken adhering to the enemy, and therefore the proprietor is pro hac vice to be considered as an enemy. The Nelly, 1 C. Rob. Adm. 219, note. If this be true, so far as it respects the present claim of the United States against the captors, I must consider it as enemy property, and decree a forfeiture accordingly.

I will add, that the claim of the United States against captors asserting their rights upon acknowledged principles of national law in a prize court, grounded upon a supposed priority from the inchoate operation of a municipal forfeiture, is quite a novelty to my understanding. I should have been glad to have seen an authority, which would countenance the application, and as it has been gravely asserted before the court, it seemed incumbent upon those, to whom the public rights in these delicate cases are confided, to have furnished some glimmering light of authority at least, by which to direct the court through this new and perilous avenue. In the only cases in the English courts, in which it seemed likely to arise, I do not find that such a prerogative was assumed or countenanced. The Walsingham Packet, 2 C. Rob. Adm. 77; The Cornelis & Maria, 5 C. Rob. Adm. 28; The Abby, Id. 251; The Recovery, 6 C. Rob. Adm. 341.

Considered, however, upon principle, the case has been well argued on the part of the United States, and I feel a pleasure in declaring, that the arguments were cogently and ingeniously urged, and if they have failed to satisfy my mind, it has not been from the want of all proper illustration. I am bound to believe, that no prerogative is pressed by the United States, which has not a substantial reason to support it, and I feel not a little embarrassed in receiving no assistance from decisions, which should enable me to support pretensions, which neither the public nor municipal law have as yet embodied in a tangible shape. I must, therefore, with great deference and submission, reject the claim of the United States, and pronounce a decree of condemnation to the original captors.

I observe in this case, that a seizure is said to have been made, pending the prize proceedings, on behalf of the United States, to enforce their claim to a municipal forfeiture of the same property. I will barely remark, that I know of no principle, that authorized a process of this kind, pending the original

prize suit. If it be permitted, it is easy to perceive, that endless embarrassments will arise, and perhaps a conflict of jurisdictions. The proper course is, for the United States to interpose a claim as in this cause, and after the completion of the prize proceedings, if the United States do not thereby obtain their full rights, the court may direct further proceeding on the revenue side. Decree of condemnation.

[On appeal to the supreme court, the decree of this court was affirmed. 8 Cranch (12 U. S.) 155.]