## THE ADULA.

### (District Court, S. D. Georgia, E. D.   August 13, 1898.)

1. PRIZE—HEARING ON EVIDENCE IN PREPARATORIO.
   At the first hearing in prize proceedings, only the evidence afforded by the examination of the captured crew, taken on standing interrogatories, the ship's papers, and other evidence of a documentary character, found upon the ship by the captors, is to be considered.

2. SAME—SHIP OF NEUTRAL CHARTERED TO ENEMY.
   When a vessel owned by a subject of a neutral power is chartered to a subject of the enemy, with full power to control her voyages and employ her in illicit trade, she is to be treated, when found attempting to violate the blockade, as if she were enemy's property.

3. SAME—EVIDENCE IN PREPARATORIO—SUBSEQUENT CONTRADICTION.
   Where the charterer of a vessel taken as prize stated in his testimony in preparatorio that he was a loyal subject of the enemy's government, he cannot thereafter be permitted to contradict the same by showing that he had cast in his lot with insurgents against that government.

4. SAME—VIOLATION OF BLOCKADE—INTENT.
   Sailing from a neutral port with intent to enter a blockaded port, with knowledge of the existence of the blockade, subjects the vessel and generally its cargo to capture and condemnation; nor does it matter that the vessel is merely in ballast, and her purpose was ostensibly to take away persons who desired to escape the hardships of the blockade.

5. SAME.
   Neutral ships, though not ostensibly destined to a blockaded port, cannot innocently place themselves in a situation which would enable them

to violate the blockade; and, where a vessel is taken while entering a blockaded port, it is no defense that she previously approached the admiral's ship to ask permission to take off refugees.

Garrard, Meldrim & Newman and Everett P. Wheeler, for claimant.
Marion Erwin, U. S. Atty., and W. R. Leaken, Asst. U. S. Atty.

SPEER, District Judge. The Adula, British steamship, was on August 3, 1898, adjudged in the district court of the United States for the Southern district of Georgia prize to the United States cruiser Marblehead and other United States vessels of war taking part in her capture while she was attempting to run the blockade established at Guantanamo Bay. The proctors for the Atlas Steamship Company, her claimant, served the following notice on the United States attorney:

"Take notice that upon the return day of the rule fixing the time and place for the hearing of the motion to take further proofs in this cause at Mt. Airy, in the state of Georgia, on the 9th day of August, 1898, at 4 p. m., we will read the affidavits of Robert Gemmell and W. Peploe Forwood, of which copies are herewith served upon you, and that upon said hearing we will move this honorable court for directions respecting the sale of the Adula, unless such directions shall previously have been given. We will also move this honorable court for an order staying the distribution of the net proceeds of the sale. And we will further apply, at the same time, for such other relief as may be just."

On the hearing of this motion, the affidavit of Robert Gemmell was offered for the claimant. By virtue of this affidavit, and the annexed statement of W. Peploe Forwood, who is the agent of the Atlas Steamship Company in Jamaica, it was sought to open the decree of condemnation granted after hearing the evidence taken in preparatorio, and open the case for additional testimony.

The hearing upon the proceedings for condemnation was upon the evidence afforded by the examinations of the captured crew, taken upon standing interrogatories, the ship's papers, and other evidence of a documentary character found upon the ship by the captors. This was done in conformity to the established rule in prize causes:

"These papers and examinations in preparatorio constitute the only evidence on which the cause is first heard. If on this evidence there be doubt, or justice require it, the court may, in its discretion, order further proof." Ben. Adm. § 612 (a).

The rule is otherwise stated by Mr. Justice Story in the case of The Pizarro, 2 Wheat. 240:

"It is upon the ship's papers, and the examinations thus taken in preparatory, that the cause is in the first instance to be heard in the district court; and, upon such hearing, it is to judge whether the cause be of such doubt as to require further proof, and, if so, whether the claimant has entitled himself to the benefit of introducing it. If the court should deny such order when it ought to be granted, or allow it when it ought to be denied, and the objection be taken by the party, and appear upon the record, the appellate court can administer the proper relief."

It is true, also, that, by the settled rule of prize courts:

"The onus probandi of a neutral interest rests on the claimant. This rule is tempered by another, the liberality of which will not be denied, that the evidence to acquit or condemn shall, in the first instance, come from the ship's papers and persons on board; and, where these are not sat-

isfactory, if the claimant has not violated good faith, he shall be admitted to maintain his claim by further proof. But if, in the event, after full time and opportunity to adduce proofs, the claim is still left in uncertainty. and the neutrality of the property is not established beyond reasonable doubt, it is the invariable rule of prize courts to reject the claim, and to decree condemnation of the property." Mr. Justice Story in The Amiable Isabella, 6 Wheat. 77.

The charterer of the Adula on the voyage which resulted in her capture was Don Jose R. Solis. He testifies that he was a loyal subject of the queen regent of Spain. In answer to the first interrogatory, Don Jose testified: "I now live at Manzanillo, on the south coast, in the province of Santiago de Cuba. I have lived there ten years next January. I am a subject and citizen of Spain, and I owe allegiance to Spain. I am married. My family and wife reside at Manzanillo." He further testified that he frequently went into the country 15 or 20 miles from the city; but, "after Gen. Weyler came in the country," he said, "I could not go in the country any more, because I feared that Gen. Weyler might suspect me of being an insurgent." Don Jose was in good standing with the Spanish government. The official card entitling him to travel as a loyal Spaniard was found in his possession, was signed by the municipal authorities at Manzanillo in 1897, and he himself testified that it was not necessary to obtain a new one. The Spanish consular authorities seem to have afforded him every facility for his operations, for as late as June 28, 1898, he received from the Spanish consul at Jamaica an indorsement of the bill of health obtained from the Jamaica authorities to enable him to prosecute this voyage. It is also in evidence that there was given to him on that day by the Spanish consul a passport authorizing him to take the Adula into the Spanish ports mentioned. He undertook to provide an efficient Spanish government pilot to conduct the ship safely into the ports of Manzanillo, Santiago, and Guantanamo. For this he was to pay for the vessel £100 per day for the first 10 days of the voyage, and after that £50 a day, until she should return to the wharf at Kingston. The charter contained this further significant provision: "The company will give the option to the charterer for another similar voyage, on similar terms, provided the charterer gives the company twenty-four hours' notice after the arrival of the steamer at Kingston." It is moreover true that Yeats, who was captain of the Adula, testified: "As I understood it, as well as I can remember, we were to go to any other ports that the charterer designated, and was not put down in the letter of instructions, if he wished to go there. As I said before, if he wanted me to go to any other port except those specified in the charter party, I was to go there." He further testified that, if the trip ran beyond ten days, there was a special agreement made between Capt. Forwood, the agent of the ship, and Mr. Solis, as to payment for this. In his answer to the thirty-ninth interrogatory, the captain of the ship also testified: "The Adula's destination was to go to Guantanamo Bay for refugees, and then to Santiago and Manzanillo, and such other places that the charterer may desire to go to after we had visited these ports." It is true that Don Jose R. Solis denied this testimony, and testified as follows: "If I was to state to the captain to go here, he would say,

'You have no right to direct me.' I did not have the right to direct them to any particular port." With this allegiance, and thus supported by Spanish authority, Don Jose chartered the Adula, and with this charter he left the harbor of Kingston, Jamaica, on the 28th day of June, 1898. With the Adula he steamed away towards Santiago, and when in sight of the blockading fleet sheered off to Guantanamo, in half a mile of the entrance, where he was hailed by the Vixen, brought to, and directed into the harbor, where the Marblehead and other war vessels were lying, and shortly thereafter was seized by order of Commander McCalla, of the Marblehead.

While it is true that the Adula was owned by British subjects, it appears from the testimony of Don Jose that for all the purposes of this voyage, having been chartered by a Spaniard, she was a Spanish ship. The authorities on this subject are as abundant as conclusive. That great admiralty judge, Sir William Scott, afterwards Lord Stowell, in The Ranger, 6 C. Rob. Adm, 126, declared: "If the owner will place his property under the absolute management and control of persons who are capable of lending it in this manner, to be made an instrument of fraud in the hands of the enemy, he must sustain the consequences of such misconduct on the part of his agent." In The Jonge Emilia, cited in 3 C. Rob. Adm. 52, a neutral vessel was condemned because she appeared to have been altogether in the hands of merchants who were enemies, and had been employed for seven voyages successively in the enemy's trade. In The Napoleon, Blatchf. Prize Cas. 296, reported in 17 Fed. Cas. 1153 (No. 10,012), it was held that, even though the claimant was a loyal citizen of high character and a resident merchant of the city of New York, opposed strongly to the purposes of the Confederates, yet when, by the acts of his agent, with whom his vessel had been left, she was placed in illicit employment, she must be condemned. It is true that, in the case last cited, the ship was actually in the use of an opposing belligerent; but in principle the authority is applicable, for here she was placed, as the court is satisfied from the testimony of the master and otherwise, in the absolute control of a Spanish subject, who was using her, as will presently appear, to run the blockade, if in the absence of blockading vessels, or by practicing upon the credulity of American commanders, he could do so with impunity. It is now sought by this motion, made long after Don Jose R. Solis had testified, to open the judgment of condemnation, and offer proof that while he originally, and before the people of Cuba were declared by joint resolution of congress to be free and independent, owed allegiance to the queen of Spain, yet that soon after the war broke out he left the island of Cuba, had taken no part in hostilities against the United States, nor been in any particular an enemy of the same, but, on the contrary, had done all in his power while he remained in Cuba to befriend and assist citizens of the United States who were still in Cuba, and that he cast his lot with the natives of Cuba, and was desirous that a stable government should be established in said island under the auspices of the United States. It is clear to the court that this evidence is altogether irrelevant. There are doubt-

less now in the island of Cuba thousands of persons, who were formerly Spanish subjects, who entertain the political sentiments to which Don Jose now wishes to subscribe. The court, however, would not be justified in permitting him to contradict his testimony given before the prize commissioners, that he was a loyal subject of Spain, nor would it be specially commendatory of the credibility of Don Jose if, in the distress of his country, when his personal interests may be involved, he is so ready to forswear his allegiance to the queen regent. Again we are assisted by the lucid announcement of Mr. Justice Story in The Pizarro, supra:

"Nor should the captured crew have been permitted to be re-examined in court. They are bound to declare the whole truth upon the first examination: and, if they then fraudulently suppress any material facts, they ought not to be indulged with an opportunity to disclose what they please, or to give color to their former statements, after counsel has been taken, and they know the pressure of the cause. Public policy and justice equally point out the necessity of an inflexible adherence to this rule."

Here we may say that Don Jose is to be treated as one of the crew. While he was charterer of the vessel, and appears to be a Spanish subject of large influence, and presumably of large means, he is entered upon the ship's books as supercargo, and it was in part to the testimony of the supercargo in The Pizarro that the animadversions of Justice Story were directed.

In The Gray Jacket, 5 Wall. 368, Mr. Justice Swayne, speaking for the supreme court, used this language:

"This is not a proper case for the order for further proof. The order is always made with extreme caution, and only when the ends of justice clearly require it. The claimant forfeited all right to ask it by the guilty concealment in his first affidavit. * * * The allowance would hold out the strongest temptation to subornation of perjury."

See. also, The Rapid, 1 Gall. 295. 20 Fed. Cas. 297 (No. 11,576); The Euphrates, 8 Cranch, 385; The Hazard, 9 Cranch, 205.

It seems clear from the evidence that the control of the Adula by the enemy is plainly shown in the first instance by the testimony of Solis, her charterer, her control by him, and the option for further voyages given him, and that further proof on this subject should not be allowed. The Adriana, 1 C. Rob. Adm. 313; The Romeo, 6 C. Rob. Adm. 351; The Sarah, 3 C. Rob. Adm. 330, cited in 11 Am. & Eng. Enc. Law, p. 489.

It appeared, also, from the proof in preparatorio, that the business of Don Jose was suspicious in the extreme. He states that his object was simply to bring off passengers, "for the sake of humanity." In answer to the twenty-sixth interrogatory, he testified:

"My calculation was, supposing the admiral allowed me to go into Santiago or Guantanamo and bring my family from Manzanillo, that I could bring four hundred passengers at sixty dollars each, making twenty-four thousand dollars, and my idea was to make the trip in six or seven days; supposing it took me ten days, it was nineteen thousand dollars net benefit. I had done it before with two English schooners. Once I took one hundred and thirty from Manzanillo and Montejo Bay."

In addition to this not altogether disinterested humanitarianism, it appeared from numerous letters, found on the person of Don Jose

and in his stateroom, that he was carrying on a large business in the shipment of supplies, and, as he admits he was plying with schooners to and from Cuba, the presumption is fair that he was engaged in continuously running the blockade.    It seems clear that for more than two months he had been engaged in the hiring and purchase of ships and in the conveyance of supplies from Jamaica to Cuban ports, and at a time when these ports were invested by the American fleet.    The claimant now wishes to show that Solis was not engaged in trade with blockaded ports, or with any ports in Cuba where intercourse was unlawful; but it may be said that Solis had ample opportunity to give the explanation of these letters in his testimony previously taken, and in fact did testify with regard to all the letters and telegrams found on his person and in his stateroom, and it does not now appear that he should be permitted to add to his testimony.    In addition to this, he bore many letters relating to trade and commerce, the conveyance of which through the blockade, especially by a Spanish subject, was a violation of the laws of neutrality.    As stated by Sir William Scott in The Rolla, 6 C. Rob. Adm. 366:

"A blockade is a naval circumvallation, intended to prevent and cut off all communication with the port that it incloses, and to cause an entire suspension of its commerce." 1 Duer, Ins. p. 247, § 24.

And Justice Washington in the case of The Tulip, 3 Wash. C. C. 181, 24 Fed. Cas. (No. 14,234), declares:

"The same principle of the maritime law which makes that species of trading which consists in the mere intercourse of buying and selling, an offense, with stronger reasons, for the public safety, must condemn the act of conveying intelligence to the enemy.    In neither case does the condemnation proceed on the ground of the party being actually an enemy, nor of the property being actually owned by an enemy; but in both cases the party acts as if he were an enemy, and therefore the maritime law treats the property as if it belonged to an enemy."

It is offered also to prove that the official blockade of the three ports Guantanamo, Santiago, and Manzanillo was not declared by the British government at Jamaica until the 6th of July, 1898. This fact can possess no significance.    The United States attorney, in resisting the motion, calls the attention of the court to the testimony of Lieut. Anderson, of the Marblehead, in his depositions taken de bene esse, to the effect that an actual and effectual blockade of Guantanamo Bay and harbor was established by the Marblehead under Commander McCalla, and other United States warships under Admiral Sampson, on June 8, 1898, and that this was continuously and effectually maintained to the capture of the Adula. He testifies that an active and effectual blockade of Santiago de Cuba was established by Commodore Schley on May 24, 1898, with the American warships which were holding the fleet of Admiral Cervera in that harbor, and that this investment was rigorously maintained to the day of the capture of the Adula.    He testified, also, to the actual and effectual blockade of Cienfuegos harbor under the president's proclamation of April 22, 1898, and that on May 9, 1898, while off Cienfuegos, he actually delivered to the Adula a copy of the president's proclamation of April 22d.    This testimony was

not before the court on the hearing of the evidence taken in preparatorio, nor is it essential to the determination of this question now, although formally submitted by the United States attorney as cause why the case should not be reopened. It appears from the testimony of Capt. Yeats before the prize commissioners that at the time he went to Guantanamo it was apparently under an order of blockade. "We passed one vessel," he testifies. "I think it was the Vixen. He fired a gun. I stopped immediately, and he told me to proceed. He did not stop his engines at all; just steamed right on by. Captain Forwood told me I should see vessels of war around there. When the Vixen hailed me, we were about half a mile from the entrance to the bay, and about four miles from where we anchored. It was only after I had anchored that I was acquainted with the blockade of the harbor." Horatio Morris, one of the crew of the Adula, testified that "at the time we went up to the mouth of the harbor, and at the time we got to Guantanamo, we found war ships there blockading the harbor. A small cruiser, the Vixen, run up across the bow, and the captain of the cruiser asked us, 'Didn't you sight the war ships to Santiago?' and the captain said, 'Yes;' and the captain stops, and he said, 'Didn't you hear Guantanamo was blockaded?' and our captain said, 'Yes.' Then he said, 'You can proceed on.' I heard about the blockade in Kingston, but, after leaving Kingston until we met the cruiser, I never heard about it any more." Capt. Yeats also testified that he expected to be stopped when he approached Santiago. The log book of the Adula shows that she was given a copy of the president's proclamation of blockade at Cienfuegos on May 9th. Solis, the charterer, testified that he was told on board the Adula that the blockade of Guantanamo was published on the 27th, the day before, but he had not heard of it before he left Kingston, but he admits that while at Kingston he heard there were some war ships at Guantanamo. There were several copies of the Kingston Gleaner on board the Adula, all of which spoke of the American operations, both military and naval, about Santiago and Guantanamo. Solis, admitted that he knew that Guantanamo was invested by the American marines. While Mr. Solis testified that he knew but little of international matters, he must have known something, for he was French vice consul at Manzanillo. Besides, the letters of instructions issued to the ship of which he was charterer contain unequivocal notice of the blockade, and Mr. Solis himself testifies that Mr. Dent, American consul at Santiago, on the 28th of June, prior to his departure on this voyage, gave him notice. In answer to the twelfth interrogatory, he testified: "I explained to Mr. Dent the idea of my voyage. He told me he was sorry he could not give me the passport I wanted, because he was not allowed to give such passports unless he had permission from the American authorities in Washington." He further stated: "I went to Consul Dent's office, and asked permission to go to these points. He asked me whether I had the consent of the Spanish consul. I told him I had it. He then said to me he was sorry he could not give me such permission. Mr. Dent told me not to go. He told me not to

go, and I answered him I was not going for anything wrong." It is further in evidence that Consul Dent warned Mr. Forwood, the agent of the ship at Kingston, of the existence of this blockade. It is true that Mr. Forwood now offers to testify that this was given in a very informal manner, but he himself admits that Dent used this language: "Well, Forwood, I would not advise you to let the ship go. They won't let her into Guantanamo, and they will be watching for her." It appears from the log book of the ship that she did not sail until an hour after the date of this interview between the American consul and the ship's agent at Kingston. The Spanish charterer of the ship and the agent were thus both given actual notice of the danger she incurred, and it otherwise appears that the charterer also communicated to the agent what the consul had told him. Notwithstanding this, the Adula was thus placed at the disposal of the Spanish subject, to communicate, if he could, with the Spaniards and Spanish subjects, by crossing the American lines, by means of access to a blockaded port.

It is established as a settled rule that a vessel which has a full knowledge of the existence of a blockade is liable to capture if she attempts to enter the blockaded port in violation of the blockade regulations, and that it is no defense against an arrest made, under such circumstances, that the vessel arrested had not been previously warned of the blockade, nor that such previous warning had not been indorsed on her register. The Admiral, 3 Wall. 615. Notice is sufficient, if the proof shows that it was known in a general way. The Stephen Hart, 22 Fed. Cas. 1253 (No. 13,364). And in Duer on Insurance (volume 1, p. 663, § 39), it is stated:

"Proof of the actual knowledge of the party at the inception of the voyage * * * supersedes in all cases the necessity of a warning, nor is it of any importance by what means or in what form he received the information, if the communication made to him is credible in its nature. * * * He is not permitted to aver that he placed no confidence in a communication that had just claims to his belief."

And, even in the absence of actual notice, since the proof was sufficient to show notoriety of the fact that a blockade existed at the port to which the voyage was commenced, it raises a presumption by which the party charged with the offense may be concluded. 1 Duer, Ins. p. 661. Even though the owners of the Adula acted in good faith, their vessel would be none the less liable to forfeiture. The law upon this subject is also plain. In the case of The Shepherdess, 5 C. Rob. Adm. 262, Sir William Scott announces this rule:

"No excuse is ever permitted for the conduct of the neutral master, who persists in his voyage to a blockaded port in defiance of sufficient and legal warning. His conduct may in no degree be imputable to the owners, yet their innocence affords no protection to their property." 1 Duer, Ins. p. 676, § 49.

It is elsewhere stated:

"It is a settled principle that, if the owners had not anticipated a violation of the public law, the fate of their vessel with respect to an infraction of that law must depend upon the conduct of the agent with whom they have intrusted its management." Jecker v. Montgomery, 18 How. 119; The Bermuda, 3 Wall. 556.

With the purpose, then, in his mind to enter Santiago, Guantanamo, or Manzanillo, or other Spanish ports, whether they were blockaded or not, this Spanish charterer brought the Adula out of Kingston harbor. The offense was committed at the inception of the voyage (The Stephen Hart, 22 Fed. Cas. 1253 [No. 13,364]); and the Adula was subject to seizure from the time of sailing with intent to run the blockade (The Circassian, 2 Wall. 135).

Sailing from a neutral port with intent to enter a blockaded port, with knowledge of the existence of the blockade, subjects the vessel, and generally its cargo, to capture and condemnation. Id. 151. Nor does it matter that the Adula was merely in ballast. 1 Duer, Ins. p. 671, § 46. It was of especial importance to the American authorities at that time that there should be no communication between the beleaguered forces at Guantanamo, Santiago, and the vicinity with the outside world, and this the Adula might well have effected by means of its Spanish charterer, ostensibly supercargo. Nor does the excuse that it was the purpose of Don Jose R. Solis to approach the American fleet, and ask permission of the admiral to take off refugees, avail the ship. Indeed, it may well be doubted, from the evidence, if he had any such purpose. It is plain that when he saw the fleet off Santiago he did not approach it, but steamed away to Guantanamo, where at that time no blockading vessels were visible. The rule is, however, that "neutral ships, although not ostensibly destined to the blockaded port, cannot innocently place themselves in a situation which would enable them to violate the blockade at their pleasure and with impunity. The intention of the party in such cases to violate the blockade is a necessary and absolute presumption." Indeed, it would be difficult to see how a blockade could be enforced if it were otherwise, but the authorities avoid the necessity of further discussion. "The intention to break the blockade is to be presumed from the position of the ship when captured. She knew of the blockade when she sailed; she had no just reason to suppose it had been discontinued; her approach, under these circumstances, to the mouth of the blockaded port, for inquiry, was itself a breach of the blockade, and subjected both vessel and cargo to seizure and condemnation." The Cheshire, 3 Wall. 235; The Delta, 7 Fed. Cas. 444 (No. 3,777). Nor does it matter that the sailing instructions given the master directed him to approach the blockading vessels, and ask permission to enter and to refuse to do so, unless this permission was granted. The Delta, supra. The language of Mr. Justice Field in the case of The Cheshire, 3 Wall. 235, is very apposite:

"If approach for inquiry were permissible, it will be readily seen that the greatest facilities would be afforded to elude the blockade. The liberty of inquiry would be a license to attempt to enter the blockaded port, and that information was sought would be the plea in every case of seizure. With a liberty of this kind, the difficulty of enforcing an efficient blockade would be greatly augmented. If information be honestly desired, it must be sought from other quarters. In the case of The James Cooke, the ship was captured at the entrance of the Texel, and the court applied this rule; observing that the approach of the ship to the mouth of a blockaded port, even to make inquiry, was in itself a consummation of the offense, and amounted to an actual breach of the blockade."

If it be conceded that the Adula simply intended to enter Guantanamo, and that Guantanamo was simply invested, and not blockaded, nevertheless her course subjected her to forfeiture. "It seems a just inference from the decisions," said the author of Duer on Insurance (page 670, par. 44), "that where the blockade has been constituted simply by the fact of an investment, although its existence was known at the port of departure previous to the sailing of the neutral ship, she may clear out provisionally for the blockaded port, but that in this, as in the former, cases, the inquiry, upon the result of which the right to complete the voyage must depend, must be made at a port of the blockading state or of a neutral power. I see no reason to doubt that the prohibition to proceed to the mouth of the blockaded port embraces all cases of a previous knowledge, from whatever source the knowledge may have been derived, and that in all its violation is subject to the same penalty."

It is unfortunate for the claimant that the Adula had been previously engaged in several ventures, some of which evinced a total disregard of the blockade established by the American commanders. It is indisputable that, with full prior notice of the blockade of Cienfuegos, both by the president's proclamation and by verbal communication, the Adula had, without permission of the American authorities, run in a supply of provisions into that place on June 15th. In answer to the forty-first interrogatory, Capt. Yeats testified:

"I was on board when we went to Cienfuegos. I was first officer, then known as first mate. We went to Cienfuegos for refugees, and, as I said previously, we had a permit from Consul Dent, United States consul at Kingston, Jamaica. That was on the first two trips. On the first occasion we were stopped by the Marblehead (May 9th; see log), and on the second time we were stopped by the Castine (May 25th; see log). They ordered us to proceed to the Brooklyn flagship. On both of those occasions we were allowed to pass after talking to the captain for some considerable time. On the first and second occasions we had permission to enter Cienfuegos, but on the third visit to Cienfuegos (June 19, 1898; see log) we had no permission that I know of. On that occasion we were not stopped, because there was nobody to stop us. The third trip was made, I think, about the 14th of June. On that trip we had some stores. Capt. Walker was in charge at that time. The Adula was chartered at that time by somebody in Cienfuegos. I do not know whether it was by a Spanish subject or not. I know that Cienfuegos was supposed to be blockaded, but we had not seen any ships there for a considerable time, and that is the reason we went."

The Adula then was a blockade runner. A blockade, once regularly proclaimed and established, will not be held to be ineffective by continued entries in the log books, supported by testimony of the officers of the vessel seized, that, the weather being clear, no blockading vessels were to be seen off the port from which the vessel sailed. The Andromeda, 2 Wall. 481. This is precisely the Adula's case. It appears, also, from a letter of Capt. Yeats to his parents, which was taken on board the Adula after her seizure, that he knew the ship was engaged in running the blockade, he had expected seizure, and it had occurred, and he complains of his hard luck to be in command at the time the vessel was seized. He also makes a statement which is strongly indicative of the fact that, even after the Adula had been permitted by permission of the Washing-

ton authorities to enter Cienfuegos for the purpose of taking off refugees, she carried out the private secretary of Gen. Blanco, governor general of Cuba. Warned off again and again by the American authorities, she persisted in her ventures. Her charterer, Don Jose R. Solis, was a man of remarkable intelligence, who we have seen was French vice consul at Manzanillo,—a Spaniard who spoke English so well that no interpreter was used by the prize commissioners in taking his testimony. How important was it, therefore, to prevent him from communicating with the garrison at Guantanamo. He had in his stateroom and in his personal possession a large number of letters of a personal nature, and relating to the conduct of business then in progress between the people of Cuba and those outside. He was the possessor of an official passport given him by the Spanish authorities authorizing him to take that ship into any Spanish port. It is true that this was not found at the time of the capture of the vessel, and has not been delivered up, but there was ample time for its destruction. It is now offered to prove by Don Jose that this passport was delivered to Commander McCalla, but he has already testified to that fact; and Lieut. Anderson, in his affidavit made in accordance with the statute, declares that he turned over all the papers seized by him under the direction of Commander McCalla to the prize commissioners. He made a complete schedule by name of the different papers, and swears that all of them were delivered, without suppression or fraud, to the prize commissioners. The disappearance of this passport for the ship to any Spanish port, rather more than the passport itself, is therefore of great significance as affecting her character, and the production of a certified copy from the Spanish consul would not throw any light upon the controversy. Spoliation or destruction of a paper of this character is strong proof of guilt. The Pizarro, 2 Wheat. 227; The St. Lawrence, 8 Cranch, 434; The Fortuna, 2 Wheat. 161, 3 Wheat, 236. Indeed, it may not be without significance that the clearance of the ship herself was simply for Guantanamo, when, according to the testimony of Solis, she was chartered for Santiago and Manzanillo, and, according to the testimony of Yeats, she might have gone to any other Spanish port. There is strong presumptive evidence that he carried other official communications with him. Among the letters he carried was one dated Kingston, June 28th, from O. Fons to Sr. Don Jose Marmion, from which the following is an extract:

"After six weeks, having been unable to write to you on account of the presence of the American squadron before that port, to-day I am told with great secrecy that Mr. Solis, of Manzanillo, with the steamer Adula, English, is going to run the blockade and carry provisions or take out passengers. I take this opportunity with great pleasure of hearing from you and of my house."

Thus, in view of the voyage to Cienfuegos, then blockaded, carrying in provisions to a Spanish consignee, and the voyage to Guantanamo, Santiago, and Manzanillo, all blockaded, and other ports not named, conveying messages on Spanish commerce, and avowedly

intending to make a large profit for himself, a Spanish subject, having options to make another similar voyage on similar terms, provided the charterer gives the company 24 hours' notice after the arrival of the steamer at Kingston, can it be doubted that the Adula was under Spanish control, and engaged in the Spanish trade, in utter disregard of the blockade established by the president and by the commanders of American vessels? Any humanitarian purpose Mr. Solis may have entertained could not properly have been accomplished without the supervision of the American commanders.

Upon careful reconsideration of the record, I am satisfied of the correctness of the decree of condemnation, and I am of opinion that the additional evidence offered, taken in connection with that already before the court, would not change the result. The motion to open the decree and admit additional testimony is therefore overruled and denied.