72 U.S. 342 (____)
5 Wall. 342
THE GRAY JACKET.
Supreme Court of United States.

*352 Mr. Ashton, Assistant Attorney-General, for the United States, and Mr. Eames, for the captors.
Mr. B.F. Butler, for the claimant: Mr. C. Cushing, being allowed leave to appear for the Treasury department.
*365 Mr. Justice SWAYNE delivered the opinion of the court.
This case comes before us by appeal from the District Court of the United States for the Eastern District of Louisiana.
In the night of the 30th of December, 1863, the steamer Gray Jacket was discovered running out of Mobile Bay by the gunboat Kennebee, one of the blockading fleet. The darkness of the night enabled the steamer to avoid the pursuing vessel. In the morning she was seen endeavoring to escape to the southward and eastward. The Kennebee fired a gun across her bows. She hauled down her colors and hove to. The captors took possession of her. Her cargo was found to consist of about five hundred bales of cotton and a few other articles of small value. She was put in charge of a prize crew and sent to New Orleans for adjudication. The claimant, Meaher, was examined in preparatorio. He states that he was born in Maine; he had lived thirty years in Mobile; he was a citizen of Alabama, and owed his allegiance to that State; he was captain of the Gray Jacket, and owned the vessel and cargo; the vessel was bound for Havana; he built her near Mobile; the cotton with which she was loaded was raised in Alabama.
Flynn, the mate, was also examined. According to his affidavit, she sailed under English colors; her machinery had broken down, and she was in a disabled condition when captured. He says, "She was taken running the blockade." ... "The owners of the vessel were Captain Meaher and brother." ... "They also owned half the cargo. The balance was for Confederate government account." ... "I know the Gray Jacket, on the trip on which she was captured, had attempted to sail covertly and secretly from Mobile, then under a blockade. She could not have left otherwise than secretly." ... "J.M. and T. Meaher *366 owned the vessel and half the cargo. The Confederate government owned the other half."
Among the papers found on board was an agreement between the claimant and Meyers, a military officer and agent of the rebel government, whereby it was stipulated that "the government will furnish the whole cargo of cotton, and will make over to the owners of the vessel one-half of the cotton, in consideration of which the owners do agree to deliver the other half belonging to the government at Havana, free of charge, except half of the expenses of pressing and storing incurred at Mobile."
That "the said steamer is to return to Mobile, if practicable; if not, then to some other Confederate port; and the government is to be allowed one-half of the carrying capacity of the steamer on the return voyage," at rates specified.
And that "in the event of a partial loss of the outward cargo, the portion of cotton saved is to be equally divided between the parties at the port of destination; and any loss on the inward cargo to be settled on the principle of general average, so far as the cargo is concerned." Meaher's affidavit in preparatorio was taken on the 26th of February, 1864. It ignored the interest of his brother in the vessel and cargo, and alleged the property of both to be in himself. It concealed the ownership of half the cargo by the rebel government and the contract between him and the rebel military agent. Upon these subjects not a word was uttered. On the 21st of March he filed an answer and claim, which do not differ materially from his affidavit in preparatorio.
The court ordered the paper to be stricken from the files, but gave him leave to file an affidavit, which was accordingly done on the 29th of August following. This affidavit sets up an entirely new state of facts. According to its averments, he never sympathized with nor gave any aid to the rebellion; the steamer was built to enable him to get away with as much as possible of his property; he did not take his family with him, lest it might excite suspicion and defeat his object; the rebel government furnished none of the cotton *367 with which his vessel was laden; he was compelled to agree that one-half of it should be taken on account of that government, and also to assent to the provisions of the contract with the rebel military agent; otherwise, he would not have been allowed to depart; it was his intention, upon reaching Havana, to claim all the cotton as his property, and to appropriate the proceeds entirely to himself; on the 18th of March, 1864, he took the oath prescribed by the President's proclamation of the 8th of December, 1863; he is not within any of its exceptions, and is entitled, by its provisions, to the restoration of the property.
The court below condemned the vessel and cargo as prize of war, and the decree is before us for review.
In this court a motion was made at the hearing, and argued at length, for an order for further proof, to enable the claimant to establish the facts set forth in the affidavit as to his loyalty to the United States, and the motives and object of his departure from Mobile with the vessel and cargo, and also to enable him to bring before this court the remission by the Secretary of the Treasury, bearing date of the 26th of March, 1866, of all right and claim to the property as forfeited to the United States, "so far as such forfeiture was incurred under the provisions of the act of July 13, 1861, and not otherwise."
The court consented at once to receive this paper without further proof, and it is properly in the case.
The questions for our consideration are:
The effect of the amnesty proclamation of the 8th of December, 1863, in connection with the oath of the claimant?
The propriety of making an order for further proof?
And whether the remission by the Secretary of the Treasury entitles the claimant to the restoration of the vessel and cargo?
The proposition as to the proclamation and oath was not pressed in the argument here. If it were relied upon, the answers are obvious and conclusive.
There is no satisfactory proof that the claimant is not in *368 one of the classes of excepted persons. His own affidavit under the circumstances, is clearly insufficient to establish the negative. "Property cases, where the rights of third persons shall have intervened," are excluded in terms by the proclamation.
The proclamation is founded upon the act of July 17, 1862, and has reference only to property subject to confiscation as there denounced.
Both the statute and proclamation are wholly silent as to maritime captures like the one before us, and neither has any application to that class of cases. In no view of the subject can this proclamation be held to extinguish the liability of a vessel and cargo running the blockade, and seized in flagrante delicto. It would be a strange result in such a case if the subsequent oath of the claimant were allowed to establish his innocence and compel the restitution of the property.
This is not a proper case for an order for further proof. The order is always made with extreme caution, and only where the ends of justice clearly require it. The claimant forfeited all right to ask it by the guilty concealment in his first affidavit, and in his subsequent affidavit and claim. The allowance would hold out the strongest temptation to subornation of perjury. There is nothing to warrant such an exercise of our discretion. We are entirely satisfied with the testimony in the case, and entertain no doubt of the correctness of the conclusions we draw from it. If the allegations of the claimant are true, he postponed his effort to escape too long to derive any benefit from it. The law does not tolerate such delay. The motion is overruled.
The order of the Secretary of the Treasury does not affect the case. It is limited in its terms to the rights of the United States, arising from forfeiture under the act of July 13, 1861. That act provides "that all goods and chattels, wares, and merchandise, coming from a State or part of a State in rebellion" into the other parts of the United States, ... . "by land or water," ... . "shall, together with the *369 vessel or vehicle conveying the same," ... . "be forfeited to the United States." It contains nothing as to goods and vessels going from a rebel to a foreign or neutral port.
The Gray Jacket was not proceeding to a loyal State. It is true that after this objection was taken by the Attorney-General to the authority of the Secretary to interpose, the claimant amended his petition by interlining the averment that he was attempting to take the property "into the loyal States by way of Havana, if his vessel should prove fit for the voyage." But this does not recall what he had before sworn, nor change the facts as they are disclosed in the record. In his first affidavit he said, "The voyage began in Mobile and was to have ended at Havana." "In case we had arrived at our destined port, I think I should have reshipped the cargo to some port where I could have obtained a better price for it than I could obtain there." The mate also testified "that the voyage began at Mobile and was to have ended at Havana." The claimant in his affidavit speaks of going to Havana, but was silent as to going beyond there, to any of the loyal States; and nowhere disclosed such a purpose until he amended his petition to the Secretary under the pressure of the occasion. We are satisfied that at the time of the capture no such intention existed. This brings the vessel and cargo within the exception prescribed by the Secretary. The order does not reach the case. But if the order of the Secretary were unqualified that the property should be released and discharged, the result would be the same. The power of the Secretary to remit forfeitures and penalties is defined and limited by law. The jurisdiction is a special one and he may not transcend it. If he do, his act is void. He has no power to remit in any case of property captured as maritime prize of war. The subject lies wholly beyond the sphere of his authority. The liability of the property is irrespective of the status domicilii, guilt or innocence of the owner. If it come from enemy territory, it bears the impress of enemy property. If it belong to a loyal citizen of the country of the captors, it is nevertheless as much liable to condemnation as if owned by a citizen or subject *370 of the hostile country or by the hostile government itself. The only qualification of these rules is, that where, upon the breaking out of hostilities, or as soon after as possible, the owner escapes with such property as he can take with him, or in good faith thus early removes his property, with the view of putting it beyond the dominion of the hostile power, the property in such cases is exempt from the liability which would otherwise attend it.
Such, with this limitation, is the settled law of this and of all other prize courts.
The case before us, as we view it, has no redeeming feature. It has no claim to the benefit of the exception we have mentioned. The vessel and cargo were properly condemned as enemy property and for breach of the blockade. There is nothing persuasive to a different conclusion.
The decree of the court below is
AFFIRMED.